Ralph Davis *v.* State.

\* Ralph Davis *v.* State.

(*Jackson.* May 24, 1893.)

1. ATTORNEY AT LAW. *Proceedings to disbar. Maintainable, when.*

An attorney may be disbarred for misappropriation of his client's funds before the client has obtained judgment against him for the amount misappropriated. (*Post, pp. 638–641.*)

Code construed : §§ 4360, 4363, 4745, 4746, 4747 (M. & V.) ; §§ 3616, 3619, 3970, 3971, 3972 (T. & S.).

Cases cited and approved : Brooks *v.* Fleming, 6 Bax., 337 ; Smith *v.* State, 1 Yer., 228.

2. SAME. *Same.*

And an attorney may be disbarred for misappropriating his client's funds before any conviction upon a criminal charge for such misappropriation. (*Post, pp. 641–645.*)

Cases cited approved : Fields *v.* State, M. & Y., 168 ; Smith *v.* State, 1 Yer., 228 ; 17 Otto, 273.

3. SAME. *Not entitled to jury trial.*

And in proceedings to disbar an attorney for misappropriation of his client's funds, he is not entitled to a trial of the issues by a jury. (*Post, pp. 641–645.*)

4. SAME. *How disbarment proceedings are tried in this Court.*

Upon an appeal from a judgment disbarring an attorney, this Court tries the case *de novo*, giving no weight to the trial Judge's findings of facts. (*Post, p. 646.*)

5. SAME. *Sufficiency of the evidence.*

This Court finds that the evidence, set out in the opinion, sustains the charge that defendant misappropriated his client's funds. (*Post, p. 646 et seq.*)

6. EVIDENCE. *Of payment.*

Plaintiff proved payment without receipt. Defendant denied payment. Plaintiff's witness proved payment and the giving of a receipt. The

---

\* Mr. Davis has recently been restored to practice upon his application to the Circuit Court at Memphis.—REPORTER.

Ralph Davis *v.* State.

defendant moved to compel production of receipt, and excepted to parol evidence of the payment. The Court overruled the motion and exception.

*Held:* This was not error. (*Post, pp. 644–646.*)

---

FROM SHELBY.

---

Appeal in error from Circuit Court of Shelby County. L. H. ESTES, J.

HOLMES CUMMINS, ESTES & FENTRESS, and MALONE & MALONE for Davis.

L. LEHMAN, TURLEY & WRIGHT, and J. M. GREER for State.

McALISTER, J. This is a proceeding in the name of the State, on the relation of Nathan Simon, commenced in the Circuit Court of Shelby County against Davis, for the purpose of having him disbarred as a practicing attorney in the Courts of the State of Tennessee. The specific grounds upon which disbarment is moved are thus set forth in the petition, viz.: That in the year 18— one Lachman was indicted in the Criminal Court of Shelby County for the crime of arson, and Nathan Simon became a surety on his bail-bond in the penalty of five thousand dollars. The said Lachman was found guilty of said charge, and the jury fixed his punishment at eight years

in the State prison. Pending a motion for a new trial, Lachman forfeited his bond and became a fugitive from justice. Such proceedings were had that judgment final was rendered against the said N. Simon and his co-surety on the bail-bond in the sum of five thousand dollars. Petitioner, desiring to be relieved of said judgment, retained the said Ralph Davis as his counsel for that purpose. Petitioner employed Davis on the fourteenth of December, 1891, and paid him on that day, at his request, a retainer fee of two hundred and fifty dollars. At a later date petitioner paid Davis an additional fee of two hundred dollars, making, in the aggregate, the sum of four hundred and fifty dollars paid him in fees on account of his employment.

The petition further recites that Davis, shortly after his professional employment as aforesaid, informed the said Simon that he had succeeded in getting the Criminal Court to agree that said judgment might be settled for the sum of twenty-two hundred and fifty dollars, and, believing this statement to be true, and confiding in the integrity of said Davis, that Simon from time to time paid over to Davis the sum of twenty-two hundred and fifty dollars. Petitioner further states that, after he had delivered the said sum of twenty-two hundred and fifty dollars to the said Davis, for the purposes and on the representations as aforesaid, Davis assured petitioner that this money had been applied to the payment and satisfaction of said

judgment, and that the same had thereby been canceled and fully discharged. Petitioner charges that said judgment has not been paid or satisfied, and that said sum of twenty-two hundred and fifty dollars has not been applied thereto, but that of this sum only one thousand dollars has been so applied, and the balance of twelve hundred and fifty ($1,250) dollars has been misappropriated by said Davis. Petitioner further avers that the fact of this misappropriation of petitioner's money was recently published in the newspapers of Memphis, which fact so infuriated Davis that he openly and publicly declared his intention to have execution issued against your petitioner on said judgment for the sum of four thousand dollars; that on the thirtieth of January, 1893, which was the next succeeding business and judicial day after said threat was made, a special order was entered in said Criminal Court of Shelby County for the issuance of an execution for the enforcement and collection of the balance of said judgment, which order the petitioner charges was caused or procured to be made by said Davis, and thus in violation of his employment and professional obligations as an attorney.

In accordance with the prayer of the petition, the defendant, Davis, was cited to appear before the Circuit Court of Shelby County on the eleventh of February, 1893, and show cause why he should not be stricken from the rolls and not be permitted to practice his profession in any Court of rec-

ord in this State. The defendant appeared, and moved to quash the petition, citation, etc., on the ground that the matters therein stated are not sufficient in law to warrant his disbarment, and because the petition and motion to disbar were premature, and because the plaintiff had no right to maintain the cause or have the relief prayed. On motion of counsel for petitioner, the proceeding was amended so as to stand in the name of the State of Tennessee, on the relation of Nathan Simon, against Davis; and thereupon the Court overruled the defendant's motion to quash the proceedings. It was then agreed between the counsel for both parties that defendant's answer need not be in writing, and the same was stated to be not guilty. The Court, after hearing the evidence and argument of counsel, adjudged that the allegations of the petition had been established by the proof; whereupon it was further ordered, adjudged, and decreed by the Court, that the defendant be stricken from the rolls as a practicing attorney of this Court and of the Courts of the State of Tennessee, and that he be deprived of his license and deprived of the right to practice his profession in any Court of record in this State. The defendant has appealed, and we are very earnestly pressed to reverse this judgment, on account of various errors that are assigned, and for the reason that the weight of the evidence does not support the finding of the Circuit Judge.

The first assignment of error is that the Circuit

Judge disregarded, in his findings, the statute relative to motions against attorneys for failing to account for money received in their professional capacity. The statute referred to is § 4360, Code (M. & V.), as follows: "Judgment may in like manner be had in favor of the party aggrieved against any attorney in this State, upon five days' notice, for any money collected or received by him in that capacity, and not paid over on demand by the person entitled, his agent or attorney." Section 4363 further provides, viz.: "Upon the return by the proper officer of an execution issued on the judgment recovered under this article, with the indorsement thereon that the money cannot be made, or not sufficient property of the defendant to be found to make the same, it is the duty of the Court to strike such delinquent from the roll of attorneys, who shall thenceforward be disqualified to practice in the Courts of this State until the debt is paid." The insistence of defendant's counsel is that the above sections of the Code prescribe the practice and set forth the law governing motions against attorneys, and that no motion to strike from the rolls or disbar an attorney can be entertained unless a judgment against him for the money has first been obtained, execution issued thereon and returned *nulla bona.* The argument is that it is nowhere shown or alleged that any notice had been given to Davis to account for the alleged shortage, nor had any judgment been recovered against him for failure to pay over. Hence, it is

claimed that the action of the Circuit Judge was premature, unauthorized, and illegal, and that it was error in the Court to refuse to quash the petition, citation, and motion.

It has been decided by this Court that this statute, giving a summary remedy by motion against attorneys for money collected in a professional capacity and misappropriated, is a substitute for the more tedious remedy by action of assumpsit, or debt, at common law. *Jones* v. *Miller*, 1 Swan, 151. The primary purpose of the statute is to afford an expeditious remedy to the aggrieved client for the misappropriation or non-payment of his money, and the suspension or disbarment of the attorney only follows his failure to pay the judgment against him. But we do not understand this statute to restrict or affect in any way the inherent jurisdiction of all Courts to deal with its officers in a summary way for malpractice or misconduct in their official character. Weeks on Attorneys, 140; *Brooks* v. *Fleming*, 6 Bax., 337; *Smith* v. *State*, 1 Yer., 228. This power of disbarment is not exercised by the Courts for the purpose of enforcing remedies between the parties, but to protect the Court and the public against the official ministration of an attorney guilty of unworthy practices in his profession. If a statute were necessary to enable the Courts to exercise this jurisdiction, it is supplied by § 4745 of the Code (M. & V.), viz.: "The several Courts of this State may strike from their rolls any person not

authorized to practice in such Courts, and also any practicing attorney or counsel, upon evidence satisfactory to the Court that he has been guilty of such misdemeanor, or acts of immorality or impropriety, as are inconsistent with the character or incompatible with the faithful discharge of the duties of his profession."

Section 4746 provides :. " If charges are preferred against an attorney or counsel to any Court, they shall be reduced to writing, and a copy furnished the party accused, who may appear and show cause against the charges."

Section 4747 further provides, viz.: " The person stricken from the rolls under either of the foregoing sections, or for other good cause, shall not be permitted to practice the profession in any Court of record in this State." We do not agree with counsel for defendant, that the Court below had no jurisdiction of this complaint for the reason there had been no judgment for the money execution thereon, and return of *nulla bona.* We think there was ample jurisdiction, both statutory and common law.

The next error assigned is that the trial was by the Court, and not by a jury. It is insisted that where the facts are disputed and the evidence is conflicting, the only proper method of trial is by jury. It may be remarked, in the first place, that there was no demand by Davis in the Court below for a trial by jury. Ordinarily, this failure to demand a jury would, as a matter of law and

41—8 P

fact, be construed as a willingness on the part of the defendant to submit the matters in controversy to the judgment of the Court, without the intervention of a jury. But it is insisted this charge is criminal in its nature, and that the Court should not have assumed to strike the defendant from the rolls as an attorney until a jury of his peers had passed upon the facts. In other words, the contention is, the charge being of a criminal nature, and the facts disputed, the Circuit Court was without jurisdiction until there had been a conviction of the defendant by a jury in a criminal prosecution. We are of opinion that the great weight of authority is opposed to this contention, and that a proceeding for disbarment is tried summarily by the Court without a jury, and that a previous conviction of the criminal offense involved is not necessary.

In the case of *Fields* v. *State*, Martin & Yerger, 168, it appeared that Fields, a Constable, had been convicted in the lower Court of a charge of extortion, and, pending his appeal, he was summarily suspended or removed from office by the County Court. It was held that a previous conviction was not necessary to enable the Court to suspend from office; that the constitutional privilege of trial by jury for crime does not apply to prevent Courts from punishing its officers for contempt, and to regulate them or remove them in particular cases; that removal from office for an indictable offense is no bar to an indictment; that it

is in its nature civil, and collateral to any criminal prosecution by indictment.

In the case of *Smith* v. *The State*, 1 Yer., 228, which was a proceeding to disbar an attorney, this Court, through Justice Catron, said, viz.: "The principle is almost universal in all governments that the power which confers an office has also the right to remove the officer for good cause. In all those cases the tribunal removing is of necessity the judge of the law and fact, to ascertain which every species of evidence can be heard, legal in its character, according to common law rules and consistent with our Constitution and laws." In this case there was no previous conviction of the offense involved; nothing but an indictment against the attorney, found in another State, and yet this Court held that the Court below might lawfully proceed with the case.

Says Mr. Justice Bradley in *Ex parte Wall*, 17 Otto, 273, viz.: "It is laid down in all the books in which the subject is treated, that a Court has power to exercise a summary jurisdiction over its attorneys, and to punish them by fine and imprisonment for contempts, and, in gross cases of misconduct, to strike their names from the roll. It is held in this case that the proceeding to strike an attorney from the roll is one within the proper jurisdiction of the Court of which he is an attorney, and does not violate the constitutional provision which requires an indictment and trial by jury in criminal cases; that it is not a criminal

proceeding, and not intended for punishment, but to protect the Court from the official ministrations of persons unfit to practice as attorneys therein; that such a proceeding is not an invasion of the constitutional provision that no person shall be deprived of life, liberty, or property without due process of law, but that the proceeding itself, when instituted in proper cases, is due process of law." Justice Bradley, in this case, draws a distinction between acts charged to have been committed by the attorney in his professional character and acts not committed in such official capacity, and holds that, in respect to these latter acts, the Courts will not strike his name from the roll until he has been regularly indicted and convicted, but that even this last exception to the rule is not an inflexible one. It follows that, under the authorities cited, which we think state the true rule on this subject, this assignment of error must be overruled.

The next assignment is that the Circuit Judge erred in not allowing the motion of defendant to compel Harry Simon to produce the receipts for twenty-two hundred and fifty dollars alleged to have been paid Davis.

In explanation of this assignment of error, it is necessary to state that the relator, Nathan Simon, testified on the trial that he made certain payments in cash and by notes to Davis, amounting to twenty-two hundred and fifty dollars, and that he took no receipts from Davis. Harry Simon, brother of relator, was introduced as a witness, and testified

that he was present at the meeting on the thirtieth
of March, 1892, and that Davis wrote, signed, and
delivered to Nathan Simon a receipt for twenty-
two hundred and fifty dollars, covering the pay-
ment of fifteen hundred dollars on the seventeenth
of December, 1891, and the two notes for two
hundred and fifty dollars each and two hundred
and fifty dollars in cash delivered to Davis on the
thirtieth of March, 1892. It is contended by coun-
sel for defendant that the receipts themselves were
the best evidence, and, on failure to produce them
or account for their absence, it was error to allow
oral proof of payment of such moneys to defend-
ant covered by such receipts. Davis himself testi-
fied that he made no such payments, and, hence,
he could not have executed such a receipt as that
described by Harry Simon. The theory of the
State was that no receipt was in fact executed, and
that Harry Simon was in error in so stating. The
state of the case, then, was simply this, that a wit-
ness introduced by a party to the suit states a fact
differently from the statement of the party himself.
Is the party bound by the statement of his wit-
ness, or may he show a different state of facts by
other witnesses? While a party cannot ordinarily
discredit his own witness, his right to prove facts
by other witnesses inconsistent with those stated
by his witness is unquestioned. Wharton on Evi-
dence, Vol. 2, Sec. 549.

The discrepancy in the statements of these two
witnesses simply went to their credibility, and was

Ralph Davis *v.* State.

a proper matter for consideration in determining the weight of their testimony. It was clearly no ground for the exclusion of all oral proofs of payment of this money, that one of the witnesses had testified that a receipt was given, and the receipt itself was not produced, or its absence explained. The witness may have been mistaken, and the question of fact was for the determination of the Court on all the evidence submitted.

The remaining question to be considered is, whether the finding of the Circuit Judge is supported by the evidence. It will be remarked that this case is not within the rule of practice established by this Court, which requires the affirmance of a judgment pronounced by a Circuit Judge without the intervention of a jury, when, upon an examination of the record, any material evidence is found to support it. This is a summary proceeding, bearing an analogy to an action for the removal of a Sheriff, or other public officer, and is to be tried by this Court like a case in equity *de novo*, requiring a preponderance of the evidence on all disputed questions of fact which are material to support the judgment.

Nathan Simon, the petitioner in the case, was introduced as a witness on the trial, and testified that he had employed Davis as his attorney in the matter of the forfeited bail-bond, for the purpose of procuring a reduction of that judgment; that Davis shortly afterwards informed him that he had succeeded in getting the Criminal Court to

reduce that judgment of five thousand dollars down to twenty-two hundred and fifty dollars, and that it could be settled by the payment of that amount. Simon testified that at a later date Davis told him he must at once pay fifteen hundred dollars on the judgment; that, thereupon, he borrowed fifteen hundred dollars from the Manhattan Savings Bank, upon the pledge of a certificate of building and loan association stock, and that he immediately turned over the money to Davis, who promised to pay it into the Criminal Court on that judgment. Simon admits that he took no receipt from Davis for the money, but states that he asked Davis if it was necessary to make a receipt for this, to which Davis replied: "No; I am going to call on you for seven hundred and fifty dollars later on."

Simon further testified that this money was paid over to Davis on the seventeenth of December, 1891, the same day it was borrowed from the Manhattan Bank, and that he gave Davis the money between 2 and 3 o'clock in the afternoon, according to the best of his recollection.

The witness further states that three days afterwards Davis told him he had paid the money into the Criminal Court. Simon further testified that on the thirtieth of March, 1892, Davis told him he wanted seven hundred and fifty dollars more for the settlement of the judgment, and on that day he paid him two hundred and fifty dollars in money and delivered to him two notes for two hundred and fifty dollars each, which were indorsed by his brother,

Harry Simon. Simon produced in evidence a check dated March 30, 1892, payable to himself, for two hundred and fifty dollars, stating that he drew the money on his way to Davis' office, and paid it to Davis, as already stated. Simon states, further, that on the same day—to wit: the thirtieth of March, 1892—on the demand of Davis, he executed another note for two hundred dollars, in payment of balance of Davis' fee, having already paid him, on the fourteenth of December, 1891, the sum of two hundred and fifty dollars. The two notes for two hundred and fifty dollars each, and the third note for two hundred dollars, were all dated March 30, 1892, payable "to the order of myself (N. Simon)," indorsed by Harry Simon, and, viz., "For collection, Ralph Davis." Simon testifies that these notes were all paid by him (not until he had allowed two of them, however, to go to protest), and that Davis got, in fees and money to be applied on the judgment, the sum of twenty-seven hundred dollars, and that, of this amount, only one thousand dollars had been applied to the payment of the judgment. Simon further states that, as the result of having charged Davis with a misappropriation of this money, he has been arrested, and is now being prosecuted on a charge of criminal libel, and that an execution had issued against him for the balance of the Criminal Court judgment, to wit: the sum of four thousand dollars; and that his store was in the hands of the Sheriff at the time he testified.

Defendant Davis testified in his own behalf. He admitted his professional employment by Simon to secure a reduction of the judgment on the forfeited bail-bond, and the payment to him by Simon of a retainer fee of two hundred and fifty dollars. Davis states that he obtained a reduction of the Criminal Court judgment to twenty-five hundred dollars, but admits that no petition was filed by him in the case, and no entry of the action of the Court in granting the reduction was made upon the minutes. Davis testifies that he reported this reduction of twenty-five hundred dollars to Simon, and advised him to settle on that basis; that Simon told him he did not have the money; that he had been trying to make arrangements to borrow some money from a building and loan association on some stock. Defendant testified that he told Simon the matter would have to be fixed up on the following day at twelve o'clock, and that on the next day Simon came to his office without the money, and suggested to Davis the advisability of his making a loan to him, Simon. Davis states he then said to Simon he thought the judgment could be temporarily suspended for one thousand dollars, and that Simon then asked him for a loan of one thousand dollars. Davis states he then asked Simon what interest he could pay, and Simon replied he would give him fifty dollars for sixty days. Defendant testifies he then sent for his brother, David Davis, who was credit man at B. Lowenstein & Bros., and, upon inquiry

in respect to Simon's financial standing, his brother told him Simon was indebted to a number of persons and to B. Lowenstein & Bros. for $2,280, but that he considered him good, as he had an interest in the Simon estate, and his brother, he says, advised him to make the loan. Davis states he then drew up a note for $1,050, payable sixty days after date, and Simon signed it; that witness and his brother then went to the wholesale department of B. Lowenstein & Bros. and procured a package of one thousand dollars belonging to defendant, from a safe where it had been previously deposited.

Defendant further states that, after getting his dinner, he went immediately to the Criminal Court, and paid over this one thousand dollars, which had come out of the box, to Hunter, Deputy Clerk of the Criminal Court, and that Hunter gave him a receipt, which he turned over to Simon. This money, the witness states, was paid to Hunter on December 17, 1891, and not later than half-past one o'clock of that day. Defendant states that the note for one thousand and fifty dollars, which Simon had given him, he deposited with his brother, David Davis; that this note was not paid at maturity, but that, in the latter part of February, Simon paid him three hundred dollars in cash, which was credited on the note, and that, on March 30, 1892, Simon executed three notes for the balance—that is to say, two notes for two hundred and fifty dollars each;

and one note for two hundred dollars. Davis further testifies that, on the same day, to wit, March 30, 1892, Simon paid him the sum of two hundred dollars, balance due on his fee, which was originally fixed at five hundred dollars, but which he had agreed to reduce to four hundred and fifty dollars. Davis denies that Simon paid him fifteen hundred dollars, or any other amount, on December 17, 1891, but, on the contrary, he states Simon borrowed one thousand dollars from him on that day, and gave him his note for one thousand and fifty dollars—covering principal and agreed interest. According to the testimony of Davis, the state of the account between him and Simon was as follows: December 14, 1891, retainer fee paid Davis, $250. December 17, 1891, loan of $1,000 by Davis to Simon. Latter part of February, 1891, cash on loan paid by Simon to Davis, $300. Three notes, dated March 30, 1891, executed by Simon to Davis, two for $250 each and one for $200, amounting in all to $700, for balance on original loan note. Cash paid Davis, for balance of fee, March 30, 1892, $200. Interest on loan, $50. Total, $1,500.

As opposed to the statement of Davis, Simon claims the matter stands thus, viz.: December 14, 1891, fee paid Davis, $250; December 17, 1891, cash paid Davis, $1,500; March 30, 1892, cash paid Davis, $250; March 30, 1892, two notes of $250, each, $500; March 30, 1892, note, balance of fee, $200. Total, $2,700.

An analysis of the respective statements of these

witnesses will show they are in entire accord on only one proposition, to wit: The payment of a retainer fee of two hundred and fifty dollars paid Davis on December 14, 1891.

They agree that an additional fee of two hundred dollars was paid Davis, but disagree in respect to the mode of payment, Simon stating it was paid by note made March 30, 1892, while Davis claims it was paid in cash at said date. Again, the parties disagree in respect to the amount of reduction reported by Davis to have been granted by the Criminal Court on the judgment, Simon stating that Davis told him it had been reduced to $2,250, while Davis claims he told Simon the judgment had been reduced to $2,500. Again, Simon affirms he paid Davis, December 17, 1891, on account of the judgment, the sum of $1,500, while Davis denies this payment, and asserts that on that day he loaned Simon one thousand dollars, for which he took his note at sixty days. Again, Simon testifies that on March 30, 1892, he made to Davis a further payment of $250 in cash, to be applied to said judgment, while Davis claims that on that day Simon paid him $200 in cash, which was balance on his fee.

Again, Simon and Davis both agree that on March 30, 1892, Simon executed and delivered to Davis two notes for two hundred and fifty dollars each, and one for two hundred dollars. Davis swears that these three notes, amounting to seven hundred dollars, were delivered to him in payment

of the balance due on the loan note. It will be noticed that these notes, in the aggregate, fall short of the balance due on the alleged loan note by the sum of fifty dollars, but Davis undertakes to explain that discrepancy by stating that Simon promised to pay him the sum of fifty dollars, which was the interest on the original loan, before the maturity of the last note. Simon swears that the two hundred and fifty dollars, in cash paid Davis on March 30, 1892, and the two notes for two hundred and fifty dollars each, delivered to Davis on that day, amounting to seven hundred and fifty dollars, was in settlement of balance due on the judgment. Simon swears that the third note for two hundred dollars, executed and delivered to Davis March 30, 1892, was in settlement of balance due on fee. Simon denies the alleged loan of one thousand dollars claimed to have been made him by Davis, and the alleged payment of fifty dollars as interest on said loan. The claim of Simon is that Davis has misappropriated twelve hundred and fifty dollars of Simon's money.

In this irreconcilable conflict in the testimony of the two principal actors in this transaction, the cardinal inquiry for the Court is to ascertain which one of the parties is sustained by the facts and circumstances disclosed in the proof and by the inherent probabilities of the case. It may be remarked at the outset that the testimony of Davis that he loaned Simon one thousand dollars, and took his note at sixty days, without security, is

improbable; and the only witness who corroborates him is his brother, David Davis. It is improbable, in the first place, that Davis would have one thousand dollars deposited with his brother in the safe at B. Lowenstein & Bros., since the evidence shows that Davis and his brother each kept a bank account, and the safe in question was not a place for the deposit of money even by the firm of B. Lowenstein & Bros. It is improbable that Davis would lend Simon one thousand dollars without demanding security, when Davis knew at that very time of the existence of this large judgment against Simon in the Criminal Court, and when, in addition to this knowledge, his brother had just informed him that Simon owed B. Lowenstein & Bros. an account for $2,280, which they had been trying to collect, and that he was indebted to other parties, which amounts he was wholly unable to pay.

Again, Davis claims that he knew, prior to making this loan, that Simon had some stock in a building and loan association, upon which he was trying to negotiate a loan, and yet Davis, with knowledge of Simon's ownership of this stock, did not ask that it should be hypothecated as collateral security for the loan he was about to make. In the face of all these facts, Davis testifies he was perfectly satisfied to make the loan without security. It is also a matter for observation that, notwithstanding Davis is shown to have kept a bank account, and to have carried on an extensive busi-

ness with the bank, he does not claim to have deposited this $1,050 note in the bank for collection, nor is there any record of any deposit of the $300 which Davis claims Simon paid him on the loan note in the latter part of February. There is, however, a record in his bank book of the three notes executed by Simon on March 30, 1892.

The facts and circumstances already adverted to, we think, illustrate the inherent improbability of Davis' version of this transaction, and we find no testimony in the record which corroborates him on the fundamental facts of the controversy, excepting the evidence of his own brother.

We do not discredit the testimony of the brother simply on account of relationship, but we give it due consideration in our investigation of the facts, and in determining the question whether the theory of the Davis brothers is sustained by the preponderance of the evidence.

Our next inquiry is whether Simon is corroborated by material facts and circumstances presented in proof. The fact is incontrovertible that, on December 17, 1891, Simon borrowed from the Manhattan Savings Bank the sum of fifteen hundred dollars by hypothecating a building and loan association certificate of stock.

Samuel Hirsh testified that he assisted Simon in securing the loan from the bank, and that Simon told him on that day his object in borrowing the money was to pay it on the Criminal Court judgment.

H. Simon, brother to Nathan Simon, testified that his brother told him on that day his object in wanting the money; and, after he had borrowed it from the bank, showed it to him, and told him he was going to pay it to Davis on 'the Lachman bond judgment. Nathan Simon, it will be remembered, testified that Davis told him on December 17 he must have one thousand five hundred dollars to pay on that judgment. Hon. Geo. B. Peters, Attorney-general of the Criminal Court, testified that Davis had promised that fifteen hundred dollars would be paid on the judgment on that day, so that the borrowing of fifteen hundred dollars on December 17 by Simon was in furtherance of the promise made by Davis to the Attorney-general of the Criminal Court. It is a striking coincidence that the sum claimed to have been borrowed by Simon on that day was the exact amount which Davis had promised the Attorney-general would be paid in on that day. The fact that Simon actually borrowed fifteen hundred dollars from the Manhattan Savings Bank on the seventeenth of December, 1891, is further established by the testimony of James Nathan, the cashier of the bank, and by the production in evidence of the original loan note itself, dated December 17, 1891. James Nathan also testified that, according to the best of his recollection, Simon told him, at the time, the object of borrowing the money was to pay it on the Lachman judgment.

Now, why should Simon borrow one thousand

dollars from Davis for sixty days, and agree to pay him fifty dollars for the use of the money, which was at the rate of thirty per cent. interest, when the proof shows that, on that very day, Simon had borrowed fifteen hundred dollars from the bank for four months at eight per cent. interest? The proof shows that Davis only paid in one thousand dollars on the judgment, notwithstanding his agreement with the Attorney-general that he would pay in fifteen hundred ($1,500) dollars on that day. Mr. Peters states: "He [Davis] asked me, if he would raise fifteen hundred dollars, if I would hold up on the balance. I asked him when that amount could be paid. He said within a day or two. I told him that, if he would pay that amount, so far as I was concerned, I would be willing to give Mr. Simon a chance to pay the residue of the bond. Mr. Davis came to see me on a certain day in December; it was the day the one thousand dollars were paid into Court. [This date is admitted by all parties to have been December 17, 1891.] Davis said to me the Simons did not have or could not pay but one thousand dollars. I told him our understanding had been that he was to pay one thousand five hundred dollars in. 'Well,' he said, 'they could not pay but this amount,' and he insisted that I would consent to let them pay in the one thousand dollars. I asked him when he could get this one thousand dollars. He said that afternoon or right away. * * * *
Mr. Davis came up within a *short while afterward*—

42—8 P

*quite late in the afternoon—and told me that he had
paid the money to Mr. Hunter,* the Clerk of the
Court; paid the one thousand dollars. Within a
few minutes," continues the witness, " I chanced
to meet Mr. Hunter, and he said the money had
been paid in by Davis." Mr. Peters states fur-
ther, that, according to his recollection, " it could
not have been *before* four o'clock in the afternoon
when the money was paid in. It was quite late
in the evening. I remember that distinctly."

The evidence is convincing that at the time
Davis was importuning the Attorney-general for
permission to pay in one thousand dollars instead
of fifteen hundred, as originally agreed, that Davis
had already collected fifteen hundred dollars from
Simon. This fact was, of course, not known to
the Attorney-general. It will be remembered that
Davis and his brother both testify that the sum
of one thousand dollars was paid to the Clerk of
the Criminal Court not later than half-past one
o'clock of December 17, 1891. In this statement
they are both contradicted by Attorney-general
Peters, an entirely credible and disinterested wit-
ness, who testified, as already seen, that the money
was not paid until quite late in the evening;
certainly not before four o'clock.

Simon testified that the money he borrowed from
the bank was in three packages of five hundred
dollars each. Hunter, the Deputy Clerk of the
Criminal Court, testified that the sum of one thou-
sand dollars paid into the Criminal Court by Ralph

Davis was, to the best of his recollection, in two packages of five hundred dollars each.

Another significant circumstance in this connection is, that James Smith, cashier of the Memphis National Bank, testified that Davis kept his account with said bank, and that, on December 18, 1891, the next day after this money is claimed to have been paid him, he made a deposit in that bank of five hundred dollars, and the witness produced the deposit ticket, in Davis' handwriting. Davis denies that this deposit of five hundred dollars was part of the money collected from Simon. He claims that part of it was the sum of three hundred and twenty-five dollars left in the safe at Lowenstein's, after the loan of one thousand dollars to Simon, and which his brother handed him the next day, and he thinks the balance of that deposit was made up of fees collected at that time. No specific amounts in fees which, added to the three hundred and twenty-five dollars handed him by his brother from the safe, would amount to five hundred dollars are shown in evidence, and we think the explanation of this deposit is unsatisfactory. Without further discussion of the facts, we are constrained to believe that the finding of the Circuit Judge is well supported by the weight of the evidence.

It is unnecessary, in this view of the case, to go into an examination of the charge made in the complaint, that Davis procured the issuance of an execution against his client for the collection of four thousand dollars, balance of Criminal Court judgment. Affirmed.