# MEMPHIS & SHELBY COUNTY BAR ASSOCIATION, Inc., v. CHARLES GORDON VICK.
## —290 S. W. (2d) 871.

Western Section.  November 3, 1955.

Petition for Certiorari denied by Supreme Court, June 8, 1956.

208

Sam P. Walker, John S. Porter, Thomas R. Prewitt, and James M. Manire, Memphis, for Memphis & Shelby County Bar Ass'n, Inc.

Aspero & Aspero, Memphis, for Charles Gordon Vick.

FELTS, J.   This is a disbarment proceding brought by the Memphis & Shelby County Bar Association, Inc., against Mr. Charles Gordon Vick, an attorney admitted to practice in this state and practicing at Memphis. Petitioner charged that respondent had been guilty of certain acts of professional misconduct which violated these provisions of our statute, Code sec. 9974:

"9974. *Attorneys may be disbarred or suspended for what causes.*—Any attorney, solicitor or counselor at law admitted to practice in the courts of the state may be disbarred or suspended from the practice of law—

"(1) Who shall commit or may have committed, any infamous crime or misdemeanor involving moral turpitude.

\*      \*      \*      \*      \*      \*

"(3) Who shall wrongfully retain money or property of his client for an unreasonable time after demand made.

\* \* \* \* \* \*

"(5) Who shall be guilty of any unprofessional conduct, dishonesty, malpractice, or any conduct which renders him unfit to be a member of the bar. (1919, ch. 42, sec. 1, Modified.)"

The acts with which he was charged may be summarized as follows:

(1) He accepted from the Credit Exchange Service Corporation employment to collect two claims at the rates set out in its two letters to him, dated September 30, 1952, and overcharged his client, and, to sustain his overcharge, he fraudulently altered these letters by inserting the words "Retail rates" in typing; and he refused, upon demand, to remit the funds to his client according to his contract of employment.

(2) He forged, or procured to be forged, the signature of his client, J. L. Lott, on a check to himself for $1,100, dated August 29, 1952, and knowing the check to be a forgery, he fraudulently uttered and cashed it at the drawee bank, Union Planters National Bank & Trust Company, and accepted and retained the proceeds.

(3) He made deliberately false and dishonest statements about these matters to petitioner's Committee on Discipline and Ethics while it was investigating the complaints against him, and made further false statements in a bill filed by him against petitioner and others in the Chancery Court of Shelby County on January 15, 1954, which bill was later dismissed.

During the Committee's investigation, on September 26, 1953, respondent promised to submit the originals of said two letters to the Committee for their inspection, but failed or refused to do so. The disbarment petition, filed March 18, 1954, stated that these original letters would be the best evidence of any alteration in them, and prayed that respondent be required to file them with the Clerk and Master.

He filed an answer to the petition on April 2, 1954, denying that he had been guilty of any of the charges. In respect of these two original letters of September 30, 1952, his answer stated: "At the Hearing of this cause, said letters will to the Court be shown". And in his answer he demanded a jury to try the issues of fact in his cause.

On April 6, petitioner moved the Court to strike the cause from the jury calendar and set it for trial as a non-jury case, and to require respondent forthwith to file the two original letters with the Clerk. He filed a response claiming that the State and Federal Constitutions guaranteed him a right to a trial by jury and a right not to be compelled to give evidence against himself by filing the letters.

On April 13, the motion was heard before Chancellor Bejach, now a member of this Court, and Chancellor Creson and they entered an order striking the case from the jury calendar and putting it on the non-jury docket, and requiring respondent, on or before April 19, 1954, to file with the Clerk the two original letters or, in the alternative, an affidavit that the filing of them would tend to incriminate him or expose him to a penalty or forfeiture.

He did not comply with this order but sought to have it set aside by a petition for certiorari and supersedeas presented to a member of the Supreme Court, who denied the petition because jurisdiction of it was not in that Court. On April 27, petitioner moved the Court to hold respondent in contempt for refusal to comply with the order. The Court, however, modified the order so as to give him time to seek a review of it by petition for certiorari and supersedeas in the Court of Appeals.

On May 5, 1954, he presented such a petition, asserting that this order violated his constitutional rights to a jury trial and against self-incrimination, and asking this Court to set aside the order on both grounds. On May 19, in an opinion by Presiding Judge Avery and Judge Carney of the Western Section, Judge Bejach not participating, this Court denied the petition upon both grounds. In respect of the first ground the Court said:

"We think there is nothing in our Constitutions, either National or State, which would require, even upon demand therefor, our courts to grant a trial by jury in a disbarment proceedings in the absence of express statutory direction so to do." (Opinion, unreported, page 4.)

In respect of the second ground, or in denial of respondent's claim that the order violated his constitutional right against self-incrimination, the Court said:

"* * * we can see no good reason why the original respondent should not file the original letters, as commanded or respond to the order of the court by making the affidavit which the court has, in the alternative, required him to make." (Opinion, p. 5)

The Chancellor again extended the time for compliance with the order so as to enable respondent to ask the Supreme Court to review the Court of Appeals' action; but he sought no such review. He later filed an affidavit that the production of the two original letters "would tend to expose him to a forfeiture". Petitioner moved to strike this affidavit, but there was no ruling on the motion. On the first day of the trial, the letters were handed to petitioner's counsel, who proposed to offer them in evidence; respondent's counsel replied: "We have no objection"; and the letters were thus put in evidence.

The cause was heard before Chancellor Little orally, or upon the testimony of witnesses and documentary exhibits introduced in open court, the trial consuming some six days, from September 22 through the 29th. The Chancellor filed his findings and opinion, reviewing the evidence at length and sustaining the charges. On October 1, 1954, he entered a decree that respondent had violated Code section 9974(1), (3), and (5), that he be permanently disbarred from the practice of law in Tennessee, and that his name be stricken from the roll of attorneys, solicitors, and counselors.

Respondent saved a bill of exceptions, appealed to this Court, and has assigned numerous errors upon the Chancellor's findings and decree. The cause was heard by this Court June 6, 1955, upon the briefs and oral arguments of counsel. Counsel were granted further time to file additional briefs; the record was later passed to the Court; and the Court took time for consideration.

The first and larger part of the brief and argument for respondent is devoted to the contention that this pro-

ceeding violated his constitutional rights in three particulars and that, therefore, before reaching the merits of the charges, we should reverse the Chancellor's decree and dismiss the proceeding or at least remand it for a new trial in order that his constitutional guaranties may be observed.

He first invokes article I, section 14, of the Constitution of Tennessee: "That no person shall be put to answer any criminal charge but by presentment, indictment or impeachment". He insists that since the matters alleged against him in the disbarment proceeding constituted a *"criminal charge"*, he could not be required to answer such matters or be tried for them in this proceeding; but that he must first be presented or indicted upon such charge in the criminal court and there tried by a jury; and that, if convicted, the record of his conviction could be the basis of a disbarment proceeding against him.

In this connection, he attacks the constitutionality of this provision of our statute relating to charges in disbarment proceedings: "* * * If the information shall charge the commission of any such crime or misdemeanor, proceedings shall not be stayed to await the result of the trial of the criminal case. * * *" Acts 1919, ch. 42, sec. 3, Code, sec. 9976. He contends that insofar as this requires an attorney first to answer a criminal charge in a disbarment proceeding, it violates the above provision of our Constitution and is void.

This argument overlooks the nature of a disbarment proceeding. Such a proceeding is neither a criminal nor a civil action, but a summary proceeding by which the court investigates the conduct of one of its officers, not to punish him, but to uphold the honor of the profession

and the administration of justice. State v. Bomer, 179 Tenn. 67, 71, 78-91, 162 S. W. (2d) 515; Davis v. State, 92 Tenn. 634, 641-644, 23 S. W. 59; Ex parte Thompson, 228 Ala. 113, 152 So. 229, 107 A. L. R. 671, 684; Matter of Rouss, 221 N. Y. 81, 84, 116 N. E. 782; In re Santosuosso, 318 Mass. 489, 62 N. E. (2d) 105, 161 A. L. R. 892, 895.

As said by Judge Cardozo, "Membership in the bar is a privilege burdened with conditions. A fair private and professional character is one of them". Matter of Rouss, supra [221 N. Y. 81, 116 N. E. 783]. "The appellant was received into that ancient fellowship for something more than private gain. He became an officer of the court, and, like the court itself, an instrument or agency to advance the ends of justice." People ex rel. Karlin v. Culkin, 248 N. Y. 465, 470, 162 N. E. 487, 489, 60 A. L. R. 851, 855.

■ The power of the court to deal summarily with its officers for misconduct in office is inherent and necessary to the administration of justice. Such power has been exercised by the court since the early common law of England. Fields v. State, 8 Tenn. 168, 171-175; Smith v. State, 9 Tenn. 228, 238-240; People ex rel. Karlin v. Culkin, supra; Ex parte Wall, 107 U. S. 265, 2 S. Ct. 569, 27 L. Ed. 552.

■ While our statutes, Code, secs. 9543, 9974-9977, regulate the procedure, they do not affect this inherent common-law jurisdiction of the court "to deal with its officers in a summary way for malpractice or misconduct in the official character. Weeks, Attys., 140; Brooks v. Fleming [65 Tenn. 331], 337; Smith v. State [9 Tenn.] 228." Davis v. State, supra, 92 Tenn. 640, 643, 23 S. W. 59, 61; State v. Bomer, supra, 179 Tenn. 71, 81, 162 S. W. (2d) 515.

■ Since this proceeding was not a criminal action to punish respondent, but an exercise by the court of its inherent common-law jurisdiction, as supplemented by our statutes, to investigate the conduct of one of its officers, it did not call on respondent to answer "any criminal charge", within the meaning of the above provision of our Constitution, and did not violate any right of respondent thereunder.

Respondent's next contention is that he had a constitutional right of trial by jury in this disbarment proceeding, art. I, sec. 6, Tenn. Const.; U. S. Const. 6th and 14th Amendments, that he made proper demand for a jury trial in his answer, and that the Chancellor's action in denying him a jury trial was so erroneous and prejudicial that we should reverse the decree upon that ground alone.

■ It will be observed that this is the same contention which respondent presented to this Court by his petition for certiorari and supersedeas and which, as we have seen, was decided against him. There has been some discussion in the briefs and in the oral arguments as to whether we may now look to that decision and as to the effect of it. The statute, Code sec. 9055, makes that former record part of the record now before us and, of course, we take judicial notice of our former opinion and decision. Davis v. Robertson, 165 Tenn. 609, 614, 56 S. W. (2d) 752, 753; Carmack v. Fidelity-Bankers Trust Co., 180 Tenn. 571, 575, 177 S. W. (2d) 351, 352; American National Bank v. Bradford, 28 Tenn. App. 239, 251, 188 S. W. (2d) 971.

■ Respondent, however, insists that the only effect of our former decision was a mere denial of his petition for certiorari and supersedeas; that is, a refusal to take

jurisdiction of the case. It is true denial of a certiorari may mean that the court declined to take jurisdiction; but it is also true that certiorari may be, and often is, denied because the court takes and tries the case on the merits and is satisfied with the results reached by the lower court. Martin v. Castner-Knott Dry Goods Co., 27 Tenn. App. 421, 429, 181 S. W. (2d) 638, and numerous cases there cited; see also Pass v. State, 181 Tenn. 613, 621, 184 S. W. (2d) 1, (where the court decided the case and denied the writ).

This Court, in its former opinion, as we have seen, considered both grounds of respondent's petition, and decided both against him, and denied the petition because there was no error in the action of the Chancellor complained of. So we think that decision is the law of the case and forecloses the question of respondent's right to a jury trial in this proceeding. Ray v. Nanney, 21 Tenn. App. 618, 619, 622, 114 S. W. (2d) 51; Life & Casualty Ins. Co. v. Jett, 175 Tenn. 295, 299, 133 S. W. (2d) 997; D. M. Rose & Co. v. Slyder, 185 Tenn. 499, 517, 206 S. W. (2d) 897, and cases there cited.

But assuming, for the sake of argument, that the question is still open, upon reconsideration of it, we are fully satisfied of the correctness of our decision that respondent was not entitled to a jury trial in this disbarment proceeding.

The constitutional guaranty of the right of trial by jury, art. I, sec. 6, refers to that right as it existed at common law—in common-law actions, not suits of an equitable nature—at the time of the formation of our Constitution. Cases not then triable by jury need not be made so now. McGinnis v. State, 28 Tenn. 43, 46-50;

Trigally v. Mayor, etc., of City of Memphis, 46 Tenn. 382, 385-386; Neely v. State, 63 Tenn. 174, 180; Hunt v. Hunt, 169 Tenn. 1, 10, 80 S. W. (2d) 666; Doughty v. Grills, 37 Tenn. App. 63, 80-81, 260 S. W. (2d) 379.

As pointed out above, a disbarment proceeding is neither a criminal nor civil action, but a summary proceeding by which the court investigates the conduct of one of its officers, not to punish him, but to guard the honor of the profession and advance the ends of justice. Such a proceeding is an exercise by the court of its inherent common-law jurisdiction, as supplemented by our statutes. Not being a civil or criminal action, it is not within the constitutional guaranty of trial by jury. Fields v. State, supra; Smith v. State, supra; Ex parte Wall, supra; People ex rel. Karlin v. Culkin, supra.

Davis v. State, supra, held that an attorney was not entitled to a jury trial in a disbarment proceeding. It is true Davis did not demand a jury, but the ruling was not put upon such narrow ground. He contended that the proceeding was criminal in nature, and that he could not be tried therein by the Circuit Court until he had first been convicted by a jury in the criminal court. The Court overruled his contention and held that "a proceeding for disbarment is tried summarily by the court without a jury". 92 Tenn. 642, 23 S. W. 62.

And that case is authority for the proposition "that a proceeding to disbar an attorney and deprive him of his *status* as an officer of the court is to be tried summarily by the court without a jury (Davis v. State, 92 Tenn. 634, 642, 23 S. W. 59)." State ex rel. Timothy v. Howse, 134 Tenn. 67-85, 183 S. W. 510, 515, L. R. A. 1916D, 1090, Ann. Cas. 1917C, 1125.

The same rule prevails in the great majority of other jurisdictions. Ex parte Thompson, 228 Ala. 113, 152 So. 229, 107 A. L. R. 671, 676, 679-684, and numerous cases there reviewed), though in a few states statutes have been enacted providing for a jury trial in disbarment proceedings, State Board of Law Examiners v. Phelan, 43 Wyo. 481, 5 P. (2d) 263, 78 A. L. R. 1317, 1322. But there is no such statute in Tennessee.

Respondent's third contention is that the Chancellor's order upon him to file the two original letters of September 30, 1952, violated his constitutional guaranties, state and federal, against being compelled to give evidence against himself. As we have seen, that order was cast in the alternative so as to require him either to file the letters or invoke his constitutional privilege. Such an order was entirely proper. People ex rel. Karlin v. Culkin, supra, 248 N. Y. 465, 162 N. E. 487, 60 A. L. R. 855; Matter of Rouss, supra.

This contention, it will be recalled, is one of the same matters which was presented by respondent to this Court in his petition for certiorari and supersedeas and which was fully considered and decided against him. For the reasons above stated, that decision is conclusive as the law of the case.

Respondent also assigns error upon the admission of these two original letters in evidence. As we have seen, his answer stated that these letters would be shown to the court at the hearing; and they were put in evidence without objection on the first day of the trial. The first witness introduced was George Gottlieb, an employee of the Credit Exchange Service Corporation; and while he was testifying, the bill of exceptions shows the following

colloquy occurred in open court between Mr. Prewitt, one of the counsel for petitioner, and Mr. Aspero, one of the counsel for respondent:

"Mr. Prewitt: If Your Honor please, this morning there were presented to us for the first time the original letters of transmittal. The record clearly reflects the efforts on the part of the Bar Association to obtain the original letters. I would like now to let the record show that I do have the two original letters of transmittal, dated September 30, 1952, which were passed to us this morning by counsel for the defendant, and I propose now to pass these two original letters to the witness and question him thereon.

"Mr. Aspero: We have no objection, may it please the Court.

"The Court: The two letters are the originals which were surrendered by you this morning, is that correct, Mr. Aspero?

'Mr. Aspero: That is right, Your Honor." Tr. Vol. 1, p. 115.

Thereupon, the letters were passed to the witness and introduced in evidence as exhibits to his testimony. In view of this consent to the introduction of these letters, respondent is now in no position to assign error upon the admission of them.

This brings us to the merits of the charges. Respondent insists that the Chancellor erred in finding him guilty of any of the charges; that the evidence fails to prove any of them. As we have seen, they fall into three groups: (1) those as to the fraudulent alteration

of the two letters of September 30, 1952; (2) those as to the forgery and uttering of the $1,100 check, dated August 29, 1952; and (3) the alleged false statements about these matters to the Committee.

Respondent is a young man 29 years of age, unmarried, and lives in Memphis. He is a graduate of Cumberland University Law School, and was licensed to practice law by the Supreme Court of Tennessee in May 1947. He is practicing in Memphis, is a member of petitioner Bar Association and, during the period here involved, was sharing office space in the Columbian Mutual Tower with Mr. Anthony A. Aspero, his leading counsel and also his most important witness.

The Credit Exchange Service Corporation (hereafter called Credit Service) was a New York collection agency, collecting commercial accounts of manufacturers, wholesalers and jobbers against merchants. It did not handle accounts of retailers against consumers. It had for collection two accounts against Ruby Jenkins, who had been in business in Memphis and had failed. One of these creditors was the Town & Country Club, to whom she owed $100; the other was the Junior Sophisticates, Inc., to whom she owed $28.25; and she had sent to each of them a check for the amount of its debt, but the checks had been returned for insufficient funds.

Taking respondent's name from the American Director of Collection Agencies (ADCA), the Credit Service, on September 30, 1952, sent him these two accounts (with the checks) for collection in two forwarding form letters, which were the same except for the names of the creditors and the amount of the debts, and which contained a schedule of fees to be paid respondent if he made the

collections. These are the letters alleged to have been altered by him, to sustain his claim for larger fees than those scheduled.

He collected these checks from Ruby Jenkins, retained one-third of each as his fee, the fee for collecting retail accounts, and sent his checks to Credit Service for the balance ($66.66 for Town & Country Club and $18.84 for Junior Sophisticates, Inc.). He mailed these checks October 6, 1952, and sent on the same day letters acknowledging receipt of the claims and stating he accepted them "under regular ADCA rates for retail accounts".

These letters and checks were received on October 7 by Credit Service, and on the same day it wrote him a letter stating that the claims were for debts due manufacturers, not retail accounts, and the fees were those fixed in the schedule in the forwarding letters. It returned his checks and asked him to make proper remittances, according to such schedule.

Respondent replied by letter stating that he had "accepted these claims under the regular ADCA retail rates"; that there was nothing in the forwarding letters stating that these were claims against a commercial firm or that commercial rates should apply; and that he remitted the correct amount. He sent back his checks and stated that if that was "not satisfactory to you, then please return my checks to me".

The Credit Service, on October 13, again wrote respondent, returning his checks and calling on him to make remittances for the correct amounts, according to the schedule of fees set out in the forwarding letters of September 30, 1952. Respondent did not reply to this letter. Thereafter, Credit Service wrote him a number

of letters, without result. He retained the full amounts of the collections, refusing to pay even what was admittedly due unless he was given a full release.

A complaint against respondent about this matter was presented to Mr. Ceylon B. Frazer, Chairman of petitioner's Committee on Discipline and Ethics, now Chancellor of the Chancery Court, Part II, of Shelby County. In the meantime, complaint was also made against respondent about the $1,100 check; and the Committee was investigating both of these matters. On September 26, 1953, respondent voluntarily appeared before the Committee and was afforded an opportunity to make any statement or explanation he chose to make about these matters.

He stated that the forwarding letters of the Credit Service showed that he had received the amounts for collection under the regular ADCA retail rates. Chairman Frazer asked if he would deliver the letters to the Committee. He replied that he would be delighted to do so. But he did not do it. After waiting some time for the letters, this Committee made its report referring the complaint to petitioner's Executive Committee.

Respondent then mailed to Chairman Frazer what purported to be photostat copies of the original letters. One of the charges is that after receiving these letters of September 30, and before having the photostat copies made, respondent altered or procured the alteration of the originals, by inserting the words "Retail rates"; and that this was done with an intent to defraud the Credit Service and to deceive the members of the Committee.

Petitioner was having the $1,100 check studied by Mr. Linton Godown, an expert on questioned documents, and

apparently desired these original letters for the same purpose. But, as we have seen, respondent refused to turn them over to the Committee but withheld them, under a claim of constitutional privilege, until after the trial began and then handed them to petitioner's counsel, and they were then put in evidence. We quote the material part of one of them:

"Charles Gordon Vick, Esq.
"Mutual Towers
"Memphis, Tenn.

"Re: Town & Country Club
Vs: Ruby Jenkins
    "Memphis, Tenn.

Amt: $100.00—A. D.
    (Debtor's "N. G." checks
    Retail rates enc.)

"Gentlemen:

"Claimant has authorized and instructed us as its agent to forward to you the above claim for collection on rates and conditions stated below:

"*Commissions Contingent upon Collection*

12% on the first $300.00
10% on the next $200.00
6⅔% on excess of $500.00
$6.00 on claims between $18.00 and $50.00
33⅓% on claims under $18.00"

The part above quoted is the same as the corresponding part of the other letter except the name of the creditor and the amount of the debt. Thus, under this schedule the fees were 12% of the larger claim and $6 for the smaller one; while under the ADCA retail rates, such fees were ⅓ of each claim. In both of these letters the words "Retail rates" were inserted, with a different

typewriter from the one used in writing the rest of the letter. Also, in the lower left-hand corner of each letter are these words, written in script with pen and ink:

"10/3/52 Ack. & accepted under
retail
regular ADCA ∧ rates. CV."

As stated, from an inspection of these letters (Exs. 8 and 9, Gottlieb), it is quite plain that the words "Retail rates" were put in after these letters were written, and inserted with a different typewriter. Gottlieb's testimony is that these words were not in the letters when they were mailed; and he produced carbon copies which Mr. Godown, the expert, found were, in his opinion, carbon impressions of the originals, and these carbon copies did not contain the words "Retail rates".

Other circumstances tend to prove that "Retail rates" were not put in these letters by the Credit Service. The claims were manufacturers' accounts, not retail accounts, and were forwarded under the specific schedule of fees for collection, which was contrary to the retail rates. It seems entirely unreasonable that this concern would send out such a self-contradictory letter, and that it did not do so is shown by its conduct and correspondence.

The proof was that the words "Retail rates" were not in these letters when they were mailed in New York. It is wholly unreasonable to think they were put in during the course of the mails. The only reasonable inference is that they were inserted after the letters were received by respondent and while they were in his possession—between October 3, 1952, when he received them, and October 15, 1953, when he had the photostats made for the Committee.

. It was not shown that during this period anyone else was in respondent's office or anyone else had access to these letters or any opportunity to insert the words "Retail rates" in them. It is true that in testifying before petitioner's Board of Directors on January 25, 1954, respondent suggested that the words "Retail rates" might have been added in the letters by a burglar who broke into his office. Then he was interrogated by Mr. Goodman, one of the directors:

" 'Mr. Goodman: You mean some burglar came in the office and added the words, "retail rates" to this letter?

"Mr. Vick: This burglar that broke into the office did some very screwy things.

\*     \*     \*     \*     \*     \*

"Mr. Goodman: Do you think some burglars may have broken into your office and put this letter in the typewriter and added the words "retail rates"?

"Mr. Vick: I don't know whether he did or didn't'. "

We must observe, regretfully, that respondent's testimony is unsatisfactory. For instance, he denied he had promised to deliver the original letters to the Committee, though it was proved that he did, by both the transcript of that meeting and Chancellor Frazer's testimony. He said he noticed the words "Retail rates" in the letters when he received them, but later said he did not then notice them, did not know who had added them, and it might have been done by the burglar.

We have referred to this script inserted in the lower left-hand corners of each letter: "10/3/52 Ack. & accepted under regular ADCA $\wedge$ rates. CV." We agree with the learned Chancellor that this is a significant circumstance. This script could not be examined before the trial but was examined by an expert with a microscope in the trial; and it then appeared that the script had been written at different times with different ink; that the word "retail" had been inserted with another ink and then the whole had been retraced with the second ink so as to give all of it the same appearance.

When this was brought out, counsel for respondent stated in his presence in open court that "we have never denied that all of the written portion of that letter was produced by the defendant"; that he first wrote all of it but "retail", then his pen "ran dry", and he used another pen to make the caret and insert "retail"; and that he then "retraced" the whole so as to make all of it the same color.

Later on, however, after it had been developed through the expert that this script was a "tracing", and after this admission in open court that defendant had "retraced" it, he seemed to dislike that word and he undertook to deny that his rewriting it was a "retracing". In this effort to make all the writing seem the same on both the letters, he must have had a purpose; and that purpose must have been to try to support his claim.

We agree with the Chancellor that the evidence, testimonial and circumstantial, proves beyond a reasonable doubt that respondent, either by himself or someone else, altered these forwarding letters of September 30, 1952, by inserting "Retail rates" in typing; that he did this

with an intent to defraud his client, Credit Service, or to mislead the Committee; and that the charges in respect of these matters should be sustained.

We come now to the charges of forgery and of uttering the forged check. Respondent had been attorney for J. L. Lott, had represented him in several matters, and had been paid by checks, some of which he had written himself and Lott had signed. He knew Lott's account in the bank was carried in the name of "J. L. Lott Lumber Co.", and he was familiar with Lott's signature, though he denies that he had any signature of Lott in his office at the time in question.

It seems that in March 1952, Lott was arrested by the Memphis Police and was charged with public drunkenness, disorderly conduct, and carrying a pistol. Respondent represented Lott in these matters. He sent Lott a number of statements and letters calling on Lott to pay his fee. It appears that there was a dispute between them, he was claiming a fee of $1,100, and Lott was refusing payment. He drew a draft on Lott which Lott refused to honor. The check in question was as follows:

"Memphis, Tenn. *August 29 1952* No. *V*
Union Planters National Bank & Trust Co.

Pay to the
  order of *Charles Gordon Vick, Attorney*    *$1,100.00*

*One Thousand One Hundred_____no/100* dollars

  *For Services rendered*      J. L. Lott Lumber Co.
   *Criminal matter.*

                         *J. L. Lott*"

This check was sent up in the original (Ex. 1, Lacey) with the transcript. It was a printed blank form and the blanks were filled in with a typewriter, all of the parts above italicized being written by a typewriter except the purported signature, "J. L. Lott", which was made by pen and ink. On September 2, 1952, respondent endorsed this check and got the bank to cash it. He asked the teller to give him the money in hundred dollar bills, which she did. He thus received and has retained the proceeds of this check.

J. L. Lott declared the check a forgery. It is true he was cross-examined as to matters which reflected upon him as a witness; but his testimony in this record appears to be frank, truthful, and trustworthy. Moreover, the case of forgery does not depend alone upon his testimony but is made out by other evidence, testimonial and circumstantial.

In the course of his business, on August 27, 1952, J. L. Lott had given the Mutual Bank & Trust Co. of St. Louis a check on his account for $1,300. When this check reached his bank on September 2, 1952, the payment of the $1,100 check had reduced his balance so that it was not enough to pay his $1,300 check, and it was returned for insufficeint funds. He was surprised when he learned of this, on September 6. He then went to the bank, found it had paid the $1,100 check; and he gave the bank an affidavit that he had not signed this check or received any benefit from it.

The Bank's vice president, Mr. Trotter, and Mr. Faithful, representative of the company carrying the bank's forgery insurance, had a number of conversations with respondent about the check. He gave them no satisfac-

tory explanation but merely said he had received it through the mail. The bank restored the $1,100 to Lott's account, the company paid the loss of the bank, and suit was brought against respondent and Lott, which, it seems, is still pending.

This check was proved to be a forgery. Such was the testimony of both the expert witness, Mr. Godown, called by petitioner, and Mr. Lacey, called by respondent. The signature "J. L. Lott" was not written but was made by *"tracing"* or *"drawing"*. It consisted of three lines: (1) impression of carbon paper, (2) in pencil, and (3) in fluid ink, and was made up of "over-write" and "patching", differing from the normal writing movement. This is made plain by the enlarged photographs (Exs. *A* and *B,* Godown) sent up. As we understand, it is now conceded that this check was a forgery.

Respondent testified that he did not forge the signature of J. L. Lott to this check, did not procure the forgery of it, and that he did not know it was not the genuine signature of Lott until his expert witness, Mr. Lacey, told him the night before the trial began. Said he, "That was the first I had knowledge that it was not the genuine signature of Mr. Lott". He further said:

"The Court: What was that occasion?

"The Witness: The night before the matter started on this on the 22nd of this month, Mr. Lacey told me that the signature was not the genuine signature, but it was a very fair simulation. That is the first time that I had knowledge that the check was not any good. I believed all the time it was the genuine signature of Mr. Lott."

Not only was the signature of this check conceded to be a forgery but the body of the check was proved to have been written on respondent's own typewriter—the same typewriter which he used in writing his letters to J. L. Lott demanding payment of his fee. This fact, however, was brought out only after the complaint was made and after the check and letters were turned over to petitioner and examined by the expert employed by it. Respondent now admits he wrote all of the check, except the signature "J. L. Lott", on his typewriter in his office.

But he did not disclose this important circumstance in any of his conversations with the bank's officers and the insurance company's representatives. When they asked him for information about the check, he merely told them he had received it in the mail. That was as much as he disclosed for a year and until he was confronted with the undeniable proof that the forged check had been filled out on his typewriter.

On September 26, 1953, he appeared before petitioner's Committee on Discipline and Ethics. He was told that they were investigating the check, and he was given an opportunity to make any statement he wished to make about it. He merely told them he had received the check in the mail. Then Chairman Frazer told him that, in order to be fair with him, they should tell him they had information that the check did not bear the genuine signature of J. L. Lott; and that it had been written on the same typewriter as the one used in writing the letters which he had identified as having been sent by him to Lott. Then, for the first time, he admitted he had written the check himself, and he advanced the explanation now relied on by him.

The proof, therefore, establishes these circumstances: Respondent was in possession of a check, the body of which he had himself written, the signature of which was a forgery; it was payable to him, he was claiming title to it, and he endorsed it and received payment on it. " 'Possession of a forged paper by accused, with a claim of title thereunder, if unexplained, raises a conclusive presumption that he forged it, or procured it to be forged.' " McGhee v. State. 183 Tenn. 20, 24, 189 S. W. (2d) 826, 828, 164 A. L. R. 617.

So the case comes down to this: Was the explanation offered by respondent sufficient to displace this presumption and to exonerate him?

This explanation was that on August 26, 1952, he called J. L. Lott at Lott's home by telephone, asked Lott to pay his fee, and threatened, if Lott didn't pay, to attach one of his Cadillac cars which his daughter was to use in her wedding on August 29, though there appeared no ground for an attachment; that Lott told him to fill out a. check for $1,100, mail it to Lott, and Lott would sign and return it; that he filled out the check in his office, mailed it to Lott on August 26, and received it back at his office by mail on Saturday morning, August 30.

He did not have any letter or carbon copy of any letter to support this story. Although he had been writing letters to Lott about paying his fee, he mailed this check, he said, to Lott without any letter of transmittal; and he said the check was mailed back to him without any letter or transmittal from Lott; and he said he had even lost the envelope in which the check was mailed to him. So, there was really nothing but his own word to support his claim that he had received the check in the mail.

Lott denied that he had agreed to pay a fee of $1,100. He said he thought this was too much; that he was willing to pay a fee, when he could, but not in the amount of $1,000. He denied that he had agreed for respondent to prepare a check and mail to him, denied that he had agreed to sign and return any such check, and denied that he had in fact signed any check. He said that the first he knew of this check was when he was notified that his $1,300 check had been turned down and he went to the bank to see about it on September 6. His testimony is supported by the circumstances.

The most significant circumstance is the fact that the signature to the check was not the genuine signature of Lott, but was a forgery. If respondent's story had been true, if he had prepared and mailed this check to Lott and if Lott had signed and returned it, as respondent claims, certainly the check would not have been a forgery.

It is true it is suggested here, as it was below, that Lott might have forged or simulated his own signature to this check, by such a three-line *"tracing"* as that appearing on this check, for the purpose of devising a plan of entrapment to involve respondent in a charge of forgery. The Chancellor rejected this suggestion as unreasonable and fantastic, and we think he was right. We think the same thing is true as to the suggestion that Mrs. Lott may have forged this check to entrap and involve respondent.

In an effort to support his claim that he had received this check through the mail in an envelope from Lott, respondent called his counsel, Mr. Aspero, as a witness. Mr. Aspero said that on Saturday morning, August 30, 1952, shortly after the mail was delivered, respondent

called him into respondent's office, and showed him a check which respondent said he had just received in the mail. We quote the material part of what Mr. Aspero said on this point:

> "* * * He stated to me, 'Look at what I have here;' and upon looking at it I stated to him, "Why, Charley, that is a very fine check. I am certainly glad for you to have it.' He remarked, 'Do you think I should cash it?' And I answered and stated, "Well, Charley, what makes you say that?' And he said, 'Well, I was quite surprised to get it. I didn't think Lott would sign it.' Then I asked him, 'How did you receive it?' And he said, 'I received it in this morning's mail.' He reached over onto his desk and picked up an envelope, and he said, 'Right in this envelope.' I examined that envelope. It was not a business envelope, and it was written in blue ink, with a return address in the upper left-hand corner, on the face of the envelope, showing, 'J. L. Lott, 40 North Goodlett St.' * * *"

As we have seen, Lott made an affidavit on September 6, 1952, that this check was a forgery. From then on until January 25, 1954, more than sixteen months, this matter, to the knowledge of Mr. Aspero and respondent, was under investigation, first by representatives of the bank and of the insurance company and later by petitioner's Committees. Yet neither respondent nor Mr. Aspero ever informed any of these representatives or the Committees investigating the matter that Mr. Aspero knew anything about it, as seems most likely they would have done if he had had any knowledge which would aid the investigation or tend to exonerate respondent.

But if his testimony be taken as true, it does not prove respondent's claim that he received the check in the envelope from J. L. Lott. It will be noted that witness Aspero does not claim to have been a witness to the fact of respondent's receipt of the check; for he asked him, "How did you receive it?" Respondent replied, "Right here in this envelope." So the matter still stands upon his word alone.

Nor does Mr. Aspero's testimony as to seeing the envelope exculpate respondent or negative the other evidence against respondent; for, as observed by the learned Chancellor, if, as seems to be the case, respondent set out in a scheme of forgery and fraud, he could have "also arranged to have the check sent to him through the mail", so as to make the transaction seem real to his office associate, Mr. Aspero.

So we find the explanation offered by respondent, to displace the presumption of forgery against him, is not corroborated by any other evidence, direct or circumstantial, but stands upon his own testimony alone. As stated above, we regret to say that his testimony is not satisfactory. He was involved in a number of self-contradictions and his testimony was contradicted by a number of witnesses whose credibility is beyond question.

We agree with the Chancellor's conclusion that respondent made no satisfactory explanation of the transaction in respect of the check and that the evidence of forgery and of uttering the forged instrument is inconsistent with any reasonable theory save that of guilt.

Of the third group of charges, one was that respondent had made a false and dishonest statement to the Committee to the effect that Lott did not dispute his fee of

$1,100 or deny that Lott has signed the check. Without detailing the proof, we find that it amply supports this charge. The same is true with respect to the charge that respondent falsely and dishonestly stated to the Committee that Mr. Trotter, vice president of the bank, had told him that they knew beyond a doubt that the check bore the genuine signature of Lott but that since Lott had made the affidavit, they were bound to proceed, regardless of what they believed.

Respondent complains that the Chancellor erred in admitting in evidence the testimony of Judge Bejach. Respondent had testified that before bringing his bill against petitioner and others, he had discussed the matter with Judge Bejach, then Chancellor; that Judge Bejach had said to respondent, "I don't think the Bar Association has a leg to stand on"; that Judge Bejach further told respondent: "File your bill and make the Bar put up or shut up."

We think the admission of the testimony of Judge Bejach was proper. It was made necessary by respondent's testimony. Judge Bejach said that he never talked about the matter with respondent until the bill was presented to him with an application for injunction; that he then read the bill, discussed it, and denied the injunction. He also said that he had not, of course, made any such statement as that the Bar Association did not have a leg to stand on; nor did he tell respondent, "File your bill and make the Bar put up or shut up."

This disposes of all the material questions made by respondent's assignments of error and brief. All of such assignments are overruled, and the Chancellor's decree is in all things affirmed. The costs of the appeal are adjudged against appellant-respondent.

It is, of course, unpleasant to enter a decree disbarring a brother lawyer; but however much the Court may sympathize with this unfortunate young man, it cannot evade or avoid the painful but imperative duty imposed upon it by a case of this character, if the honor of the profession and the administration of justice are to be upheld.

Avery, P. J., (Western Section) and Carney, J., Concur.

Bejach, J., not participating.