# MEMPHIS & SHELBY COUNTY BAR ASSOCIATION, Appellee, v. JAMES T. SANDERSON, Appellant.
## —378 S. W. (2d) 173.

Western Section. July 31, 1963.

Rehearing Denied September 3, 1963.

Certiorari Denied by Supreme Court January 8, 1964.

Rehearing Denied by Supreme Court March 5, 1964.

Charles C. Burch, Memphis, John J. Hooker, Jr., Nashville, for appellant.

Cooper Turner, Jr., James Manire, Memphis, for appellee.

CARNEY, J. The respondent below, James T. Sanderson, has appealed from a decree of the Chancery Court of Shelby County, Tennessee, disbarring him permanently from the practice of law. The petition was filed by the Memphis & Shelby County Bar Association in Part II of Chancery Court of Shelby County, Chancellor Ceylon B. Frazer, presiding. Respondent moved that all three Chancellors of the Tenth Chancery Division of Tennessee sit upon the hearing of the cause. Chancellor Frazer denied the motion but invited the other two Chancellors to sit with him. Chancellor Charles Rond accepted the invitation but later recused himself because of participation in some part of the Bar Association proceedings relating to Mr. Sanderson prior to Chancellor Rond's elevation to the bench. The invitation was accepted by Chancellor Robert Hoffman and he sat with Chancellor Frazer during the trial.

The petition for disbarment filed by the Bar Association on April 11, 1962, alleged eight separate instances of misconduct on the part of Attorney Sanderson. Be-

fore trial a ninth charge was added by supplemental petition. These instances of alleged misconduct will be referred to as the Baldwin case, the Byrum case, the Berryman case, the Newby case, the Miller case, the Martin case, the Cryer case, the Naylor case, and the Moss case. The matter concerning Moss was the one which was added by supplemental petition.

Petitioner based its cause of action on the inherent jurisdiction of the Court and on the statutory jurisdiction set forth in Section 29-308 et seq. of the 1956 Tennessee Code Annotated, alleging violation particularly of the letter and spirit of the following provisions of Section 29-308:

*"29-308. Grounds for disbarment or discipline.—* Any attorney, solicitor or counselor at law admitted to practice in the courts of the state may be disbarred or suspended from the practice of law—

\*    \*    \*    \*    \*    \*

(3) Who shall wrongfully retain money or property of his client for an unreasonable time after demand.

\*    \*    \*    \*    \*    \*

(5) Who shall be guilty of any unprofessional conduct, dishonesty, malpractice, or any conduct which renders him unfit to be a member of the bar."

The period of time covered by these several alleged instances of misconduct runs from April 25, 1958, to July 30, 1962. The Baldwin case, the Newby case, the Byrum case, the Miller case, the Cryer case and the Moss case all involved the alleged misuse and mingling of clients' funds and failure to account promptly therefor. The Bar Association contends that in the Martin case the

appellant was guilty of representing conflicting interests, namely that he accepted the suit of Mrs. Martin for a divorce and at the same time accepted a representation of Mr. Martin for a claim for workmen's compensation.

The gravamen of the Berryman case is that the respondent acceded to the request and entreaty of a 17 year old girl and furnished her with the name of a person who would and did perform an abortion upon her. The young woman was not a client of the respondent and he had never known her before. She obtained his name from a mutual friend. The woman whose name he furnished was a colored maid or nurse. Appellant received no fee and had no connection with the operation. Respondent was indicted, tried and convicted in the Criminal Court of Shelby County on charges of contributing to the delinquency of a minor. However, upon an appeal, the Supreme Court of Tennessee reversed the conviction and dismissed the charges upon the facts saying that the young woman was already delinquent, as clearly shown by the proof and that therefore, the defendant could not be guilty of contributing to her delinquency.

The gravamen of the Naylor case is that the respondent filed a divorce bill for Mrs. Naylor against her husband and one of the grounds of divorce charged therein is adultery on the part of Mr. Naylor with Mrs. Sanderson, wife of the respondent.

Respondent filed a motion to dismiss the petition for disbarment which was somewhat lengthy and involved. Substantially it averred that the charges were fatally defective because they failed to aver intentional malfeasance; failed to charge fraud and dishonesty on the

part of the respondent; and that such grounds did not constitute misconduct in office sufficient to justify disbarment. This motion was overruled and the respondent filed his answer to the petition.

This answer consisted of a detailed explanation of appellant's actions and conduct relating to the nine specific charges of misconduct made against him. The trial began November 19, 1962, and continued about seven days. In an extensive discussion of each of the specific charges, the Court below found all the issues in favor of the Bar Association and against Mr. Sanderson and rendered the decree of permanent disbarment.

From the findings and opinion of the Court below we copy the following excerpts:

"There seems a minimum of factual dispute as to many of the specifications alleged when camouflage is stripped away.

"Preliminarily, it should be stated that this record is rife with conflicting statements by Sanderson regarding the monetary specifications, evidencing a disregard of any obligation to tell the whole truth.

"There is material conflict between Sanderson's sworn Answer and his testimony in Court and there are many contradictions between his testimony before Bar Committees and his testimony on the witness stand. A most casual reading of his cross-examination evidences these necessary conclusions.

"His testimony in open Court evidences an indifference to the presentation of careful truth to which any Court is entitled. * * *

"Sanderson, from his own lips, is not entitled to full faith and credit as a witness.

\* \* \* \* \* \*

"In each specification involving money payable to a client or for a client, the money had to be pried out of Sanderson, principally by the employment by the client of an additional attorney or through the offices of the Committee on Discipline and Ethics of the Bar Association.

"The record includes testimony that Sanderson kept large sums of money in his pocket and in his case files. This testimony is not only unworthy of belief in itself but is disproved by his actions, the status of his bank accounts and the number of checks drawn by him which were dishonored and could not be seasonably paid by him.

"The above findings of the Court are established by proof considered clear, cogent and convincing, and, further, are considered established beyond any reasonable doubt.

"The defense of the respondent to the specifications involving non-payment to or for a client appear to be based, generally, upon the following theories: (1) He didn't have the money to pay that which belonged to his client and was admittedly due; (2) no formal demand was made for the money; or (3) he is not guilty of fraud since he didn't intend to permanently deprive his client of the money admittedly due.

"It is the view of the Court that Sanderson's conversion or allowing the conversion of his client's

money is no excuse for non-payment to the client; formal demands, if such were ever necessary under the acts of this cause, were abundantly made upon Sanderson; and specific proof of the intent to permanently defraud is not a necessary element of the maintenance of a disbarment action.

"It is the conclusion of the Court that James T. Sanderson has manifested traits of character inconsistent with his duty to the Courts and his duty to his clients, and that he has been guilty of conduct which renders him unfit to be a member of the Bar.

"The delinquencies of Sanderson have been continuing despite the reprimand of November 14, 1958.

"It is the judgment of the Court that, under the inherent jurisdiction of the Court to discipline its officers and under the pleaded statutory provisions, the respondent, James T. Sanderson, is permanently disbarred, he is permanently deprived of the right to practice law, and he is enjoined from engaging in the practice of law."

The respondent has filed fourteen assignments of error in this cause. Thirteen of these assignments assail the findings by the lower court. Assignment of error No. XIV insists that the court erred in failing to refer the charges for investigation to a Committee of Special Masters who had already been appointed by the Chancery Court pursuant to an order previously entered in the cause of Ex Parte Memphis & Shelby County Bar Association, Inc. We discuss this assignment of error first.

On September 9, 1960, the Chancery Court of Shelby County, Tennessee, sustained a petition filed by the Memphis & Shelby County Bar Association and appointed nine Special Masters to act in committees of three each. The Special Masters were authorized to conduct investigations from time to time for and in behalf of the court for the purpose of inquiring into any unethical, unlawful or improper practices of any attorneys in Shelby County, Tennessee. However, the decree expressly provided that such Special Masters should conduct only such investigations and inquiries as the court should direct. The decree also recited that the petition of the Bar Association was being sustained on the authority of the opinion of the Supreme Court of Tennessee, Mr. Chief Justice Neil, Re: Petition of Chattanooga Bar Association, 206 Tenn. 7, 330 S. W. (2d) 337.

■ Doubtless the Chancellors below had authority and discretion, upon motion of the respondent, to refer these charges against Mr. Sanderson to a committee of three Special Masters for investigation under the decree of date September 9, 1960. However, certainly we cannot say that the court was in error in failing so to do. There is nothing in the decree of September 9, 1960, nor in the opinion of Chief Justice Neil in Re: Chattanooga Bar Association, 206 Tenn. 7, 330 S. W. (2d) 337, supra, to indicate that the appointment of Special Masters for the purpose of conducting investigations constituted an exclusive method by which petitions of disbarment would be heard and considered. Accordingly, assignment of error No. XIV is respectfully overruled.

We turn now to a review of the several charges of misconduct made against the respondent.

692

■ This appeal comes to this court for trial de novo accompanied by a presumption of correctness of the decree of the court below, T. C. A. Section 27-303. Therefore, this court can reverse only in the event it finds that the evidence preponderates against the finding and decree of the lower court.

The appellant, James T. Sanderson, age 32, is a native of Bolivar, Hardeman County, Tennessee. He finished high school in Bolivar, Tennessee, and enrolled in Memphis State University where he was graduated in 1953 with a degree of Bachelor of Science. He also was graduated from Southern Law School in Memphis, Tennessee, and admitted to practice during the same year. Mr. Sanderson's family was of modest means and he had been compelled to work part time by playing in an orchestra in order to get himself through school. He served two years in the Armed Forces and returned to Memphis, Tennessee, where he seemed to be eager to engage in the practice of law.

After he returned to Memphis, Mr. Sanderson worked one year as a deputy in the office of the Clerk of the Probate Court of Shelby County, Tennessee. He served one year as a cub in the office of one of the leading law firms in Memphis, Tennessee, after which he began practice on his own about 1957. Apparently he is a young man of ability and energy.

Mr. Sanderson has been twice married. He and his first wife were divorced sometime about 1957. So far as the record shows he is still living with his second wife, Mrs. Dorothy L. Sanderson. A number of Mr. Sanderson's clients seem to come from Hardeman County, Tennessee, where he was reared.

Mr. Sanderson's trouble with the Bar Association started in 1958. On November 14, 1958, the Executive Committee of the Memphis & Shelby County Bar Association wrote to Mr. Sanderson as follows:

"MEMPHIS AND SHELBY
COUNTY BAR
ASSOCIATION
Incorporated

Memphis, Tennessee
November 14, 1958

Mr. James T. Sanderson
Memphis, Tennessee

Re: Complaint of Professional Misconduct

Dear Sir:

You are advised that the Executive Committee has, after the hearing accorded to you on Wednesday, November 5, 1958, as adjourned to Friday, November 7, 1958, reached the following decision and conclusions with respect to the complaint of professional misconduct filed with and presented by the Committee on Discipline and Ethics:

As you are advised, the complaint, as presented to the Executive Committee, was based upon five separate and distinct matters or cases, that is, the Baldwin, Linden, Newby, Hodge and Berryman cases.

It is the decision of the Executive Committe that the evidence presented with respect to the Linden and Hodge divorce cases does not warrant any finding of professional misconduct.

With respect to the Baldwin and Newby matters or cases, it was felt by all of the members of the Executive Committee that your conduct in mingling and using funds of these clients constituted professional misconduct, and the Executive Committee so found and held. It was further held and decided unanimously by the Executive Committee that because of your age and limited experience, the penalty or punishment recommended or meted out to you should be a reprimand. You are, accordingly, advised that for your conduct in the Baldwin and Newby cases, you are reprimanded. This, of course, means that your conduct in these cases was far from what should be expected of a lawyer, and that in these instances you seriously violated the trust placed in you by your clients. In other words, for such conduct you are by the Executive Committee severely reproved, reprehended and formally censured.

With respect to the Berryman matter, it was felt and held by the Executive Committee that its decision and judgment should be suspended pending the final disposition of your indictment by the Shelby County Grand Jury based upon your conduct in this matter and case. Hence, the complaint of professional misconduct based upon the Berryman case has been referred back to the Committee on Discipline and Ethics, with directions to that Committee to closely observe the proceedings in the Criminal Court of Shelby County, Tennessee, and, upon the final disposition thereof, to report this complaint back to the Executive Committee.

With respect to the finding and reprimand of the Executive Committee based upon your conduct in the Baldwin and Newby cases, you are advised that, under the provisions of the bylaws of this Association, you have the right to appeal the decision of the Executive Committee to the Board of Directors.

Very truly yours,

MEMPHIS & SHELBY COUNTY BAR ASSO- CIATION, E X E C U - TIVE COMMITTEE

By /s/ John S. Montedonico

JSM:VS
CC Mr. Hugh Stanton
Mr. Robert McRae
Mr. Vincent Beal''

It is to be noted that the Baldwin, Newby and Berryman cases mentioned in the letter are three of the nine instances of misconduct charged in the petition for disbarment.

On March 10, 1960, the Supreme Court of Tennessee, through Justice Burnett (now Chief Justice) announced its opinion reversing the appellant's conviction in the Criminal Court of Shelby County, Tennessee, and dismissing the charges of contributing to the delinquency of a minor.

On January 17, 1961, Mr. Emanual Rosenberg, an attorney of Decatur, Illinois, wrote to the Honorable Phillip M. Canale, Jr., District Attorney General of Shelby County, Tennessee, charging Mr. Sanderson with

having failed to pay over to his client, Leroy Miller of Decatur, Illinois, certain funds which Mr. Sanderson had collected for Miller. This letter was forwarded to the Committee on Discipline and Ethics of the Memphis & Shelby County Bar Association.

On February 3, 1961, Mrs. Inez Martin of Memphis, Tennessee, addressed a handwritten letter to the "Bar Association" in which she made complaint that she had paid $50.00 to a private detective named Goodwin upon the advice of Mr. Sanderson; that she had paid Mr. Sanderson $50.00 on a divorce case and that she had not received satisfactory services from either of them. She asked the help of the Association in obtaining the return to her of her $100.00.

On February 23, 1961, the Discipline and Ethics Committee of the Bar Association conducted a hearing with Mr. Sanderson present in connection with the Martin and Miller complaints.

Shortly after June 5, 1961, Mr. William Robert Cryer of Bolivar, Tennessee, complained to Honorable James Winchester, attorney of Memphis, Tennessee, who was a member of the Committee on Discipline and Ethics of the Memphis & Shelby County Bar Association that Mr. Sanderson had withheld certain funds out of a workmen's compensation settlement for payment of certain outstanding doctors' bills; that the bills had not been paid and that he was continuing to receive statements from the doctors therefor.

On August 24, 1961, a second hearing of the Committee on Discipline and Ethics was held with Mr. Sanderson present in connection with the complaints against Mr.

Sanderson made by Willie Robert Cryer and also the matter of Thomas Oren Byrum. No complaint was made by Mr. Byrum to the Bar Association directly but the Bar Association came across the Byrum matter in the course of its investigation of one of the other complaints against Mr. Sanderson.

On September 12, 1961, James R. Winchester, chairman of the Discipline and Ethics Committee, wrote a letter to the president and members of the Board of Directors of the Memphis & Shelby County Bar Association advising of the two hearings concerning the complaints against Mr. Sanderson; forwarding transcripts of the evidence heard by the committee and stating that the committee was of opinion that Mr. Sanderson had been guilty of unethical, unlawful and improper conduct justifying disbarment. The petition for disbarment was filed April 11, 1962, in Chancery Court.

## I.

## THE WOODROW BALDWIN CASE

In April, 1958, Mr. Sanderson settled a personal injury and property damage claim arising out of an automobile accident for Woodrow Baldwin in the amount of $1,000. It was agreed between him and Baldwin that Mr. Sanderson would retain $400.00 as his fee and $82.50 for the payment of certain medical expenses. Baldwin was a young man about 21 years of age and he did not want his father to know about his having the money. It was agreed that Mr. Sanderson would keep the $517.50 and let Baldwin draw it as he wanted it. On April 25, 1958, Mr. Sanderson issued Baldwin a check payable to cash in the amount of $188. Baldwin cashed this check

at W. E. Kent Grocery Store. The check was returned by the bank to Kent marked "insufficient funds." Kent made several unsuccessful efforts to get the check paid and finally reported the matter to the Bar Association. After Sanderson learned that the matter had been reported to the Bar Association, he made the check good on July 5, 1958. He also obtained a statement in writing which he filed with the Bar Association Committee that he, Baldwin, had been paid in full and was entirely satisfied with Sanderson's services.

## II.

### THE WILLIAM NEWBY CASE

In early 1958 William Newby, a merchant of Somerville, Tennessee, turned over to Mr. Sanderson for collection notes approximating $400 in face value owed by two Shelby County colored school teachers. On June 18, 1958, Mr. Newby asked Mr. Sanderson for an accounting to which Mr. Sanderson reported that he had collected $140. It was agreed that Sanderson would retain $30.00 as a fee and Mr. Sanderson gave Mr. Newby his check in the amount of $110 drawn on the First National Bank of Memphis, Tennessee.

Mr. Newby deposited the check in his bank in Somerville, Tennessee, and the check was returned on two different occasions marked "insufficient funds." Mr. Newby made a complaint to the Bar Association. Two members of the Committee on Discipline and Ethics visited Mr. Sanderson at his office in Memphis on September 17, 1958, which was a Thursday. By coincidence Mr. Newby came into the office while they were there. Mr. Sanderson told Mr. Newby that the check would be good on

the following Monday which would have been September 21. Actually the check was not good on September 21. However, on September 23, 1958, Mr. Sanderson wired Mr. Newby's bank in Somerville the sum of $110 in full payment of the check.

## III.

## THE BERRYMAN CASE

On May 10, 1958, Mr. Sanderson was visited in his office by Mary Florene Berryman, age 17. She requested him to give her the name and address of someone who would perform an abortion upon her. The appellant had already been solicited by one Reginald Adkins, a former client and apparently the paramour of Miss Berryman, to furnish such information. Miss Berryman was unknown to Mr. Sanderson on the occasion of her visit.

Mr. Sanderson furnished the name of a colored maid and/or nurse named Leona McWay to Miss Berryman and some six weeks later, without any further knowledge or activity on the part of Mr. Sanderson, Leona McWay performed an abortion on the Berryman girl. Knowledge of the abortion reached the police authorities and the newspapers and Mr. Sanderson received much notoriety from having furnished the name of the abortionist. On July 18, 1958, Mr. Sanderson was arrested and later indicted and convicted on contributing to the delinquency of a minor.

On September 17, 1958, after Mr. Sanderson had been arrested, two members of a subcommittee of the Committee on Discipline and Ethics, Mr. Morris Strauch and Mr. Frank Byrd, of the Memphis and Shelby County Bar Association called on Mr. Sanderson at his office

in Memphis to discuss with him two matters: (1) The Newby bad check of $110 on which Mr. Newby had entered a complaint to the Bar Association and (2) the wide and unfavorable publicity which Mr. Sanderson had received as a result of his arrest in the Berryman case.

Mr. Sanderson told them he would pay Mr. Newby and Mr. Newby came by the office while they were there. There is a conflict as to what Mr. Sanderson told Mr. Strauch and Mr. Byrd about the Berryman case.

On the trial below Mr. Strauch and Mr. Byrd testified that upon their first interview with Mr. Sanderson on September 17, 1958, he told them he did not feel that he had done anything wrong in giving the girl the name of the abortionist; that he had sent another girl or woman whom he himself had gotten pregnant to this same abortionist. On September 22, 1958, Mr. Strauch and Mr. Byrd called on Mr. Sanderson at his office and suggested that he surrender his law license to the Supreme Court. Mr. Sanderson conferred with a lawyer and then refused.

Mr. Sanderson, on the trial below, denied that he told Mr. Strauch and Mr. Byrd that he had sent anyone else to the abortionist. He testified that he told them that he got the name of the McWay woman from a Miss Hooper who lived in a boarding house with several other women; that these women were "party" girls and that Miss Hooper had told him that she or some of the women had had abortions performed by the McWay woman.

## IV.

### THE THOMAS OREN BYRUM CASE

In February, 1958, Mr. Sanderson was employed by Thomas Oren Byrum of Bolivar, Tennessee, to represent

him in a personal injury and property damage claim. Mr. Byrum married Mr. Sanderson's father's sister. After Mr. Sanderson had made a tentative settlement of the claim he forwarded to Mr. Byrum the necessary release forms which were returned to Mr. Sanderson by mail. On June 5, 1958, Mr. Sanderson collected the sum of $600.00 from the liability insurance carrier, signed the name of Mr. Byrum thereto and deposited the $600.00 in his, Sanderson's bank account. Apparently Mr. Byrum had given Sanderson authority to sign his name to the check.

It was understood that Sanderson was to receive $200.00 attorney's fees and that $400.00 was to be remitted to Mr. Byrum. Sanderson did not remit the $400.00 to Mr. Byrum during the months of June, July or August, 1958. On September 22, 1958, Mr. Byrum retained Hon. Joe C. Davis, attorney of Lexington, Tennessee, to look into the matter of his claim which Mr. Sanderson was supposed to have settled, Mr. Davis learned from the insurance carrier that Mr. Sanderson had collected the money and thereupon he wrote a letter to Mr. Sanderson stating that Mr. Byrum had signed releases for the settlement but had never received his money. He demanded that Mr. Sanderson pay Mr. Byrum the $400.00. Mr. Sanderson did not reply to Mr. Davis' letter. On September 26, 1958, Mr. Sanderson went to Bolivar, Tennessee, and told Mr. Byrum that he had settled the claim and gave him the contents of his file and promised to pay Mr. Byrum shortly. He drew a check dated September 30, 1958, to the order of Mr. Byrum on an account which was opened the same day in the bank by the deposit of $700.00. This check was paid on October 4, 1958. Mr. Byrum made no complaint to the Bar Associ-

ation about Mr. Sanderson and testified as a witness for him at the trial. The Bar Association learned about the Byrum matter while investigating the Leroy Miller matter.

## V.

### THE LEROY MILLER CASE

Leroy Miller is a colored man living in Decatur, Illinois. He grew up in Hardeman County, Tennessee. His father worked on the farm for Mr. Sanderson's father and Mr. Sanderson and Leroy Miller have been friends through the years. On or about October 31, 1959, Leroy Miller was involved in an automobile collision on the way from Decatur, Illinois, to Hardeman County, Tennessee, for a visit. With him were his wife, Mary Miller, their minor child, Jacqueline, his brother, Wendell Miller. Leroy Miller's automobile was practically destroyed. The daughter, Jacqueline Miller, sustained a fractured leg. Wendell Miller and Mary Miller sustained only cuts and bruises. Leroy Miller retained Sanderson to represent him in the suit of his claim for damages.

On March 31, 1960, Mr. Sanderson, the appellant, settled all the cases for a total of $1,000 of which $250 was to go to Leroy Miller and wife, Mary Miller, as parents and guardians of Jacqueline Miller; $700 for Leroy Miller and Mary Miller and $50 for Wendell Miller. The appellant had the contract on a 40 percent contingent basis leaving a net of $600 for all the Millers. General releases were signed by the Millers in Decatur, Illinois and returned by mail to appellant, Mr. Sanderson, who delivered them to the insurance carrier.

On April 14, 1960, Mr. Sanderson wrote Leroy Miller in Decatur, Illinois, that the drafts had been presented

for payment at the Union Planters National Bank in Memphis which had forwarded them for collection on a bank in Columbus, Ohio. Mr. Sanderson promised to send a check to Leroy Miller as soon as the bank informed him that the checks had been cleared. The checks were cleared on April 19, 1960, and Mr. Sanderson's account in the Union Planters National Bank in the name of "James T. Sanderson or Dorothy L. Sanderson" was credited with the entire proceeds of $1,000. Mr. Sanderson did not remit any of this money to the Millers and there was no written correspondence between him and the Millers for several months thereafter.

On August 26, 1960, Mr. Emanual Rosenberg of Decatur, Illinois, attorney at law, wrote a letter to Mr. Sanderson in Memphis, Tennessee, making demand for the $600 which Mr. Sanderson had promised to send to Leroy Miller in prior correspondence which Mr. Rosenberg had before him. Mr. Rosenberg explained that the mother-in-law of Leroy Miller was employed in his, Rosenberg's, home. Mr. Sanderson ignored this letter of Mr. Rosenberg entirely. On September 15, 1960, Mr. Rosenberg wrote a second letter to Mr. Sanderson referring to the letter of August 26, 1960, and again demanded payment of the $600 and mentioned that it might be necessary to take the matter up with the Bar Association. Mr. Sanderson ignored this letter.

Mr. Sanderson testified that sometime about April 16, 1960, in a long distance telephone call with Leroy Miller, Leroy Miller agreed that Mr. Sanderson might borrow the $600 due and owing for an indefinite period with the understanding that Mr. Sanderson would repay such loan at any time upon the demand of Leroy Miller. No

part of this agreement was in writing and no note was made. Mr. Sanderson further testified that on August 21, 1960, he was engaged in a long distance telephone call to Leroy and that Leroy agreed that the loan might be extended. Mr. Sanderson further testified that after receiving Mr. Rosenberg's letter of August 26, 1960, he talked to Leroy Miller again by telephone; that Leroy informed him that he had not employed Mr. Rosenberg to write the letter and that his mother-in-law, who worked as a domestic in Mr. Rosenberg's home, had taken it upon herself to have Mr. Rosenberg write about the money and that Leroy told him, Sanderson, not to pay any attention to the letter.

Sometime during the latter part of September, 1960, Mr. Sanderson sent Leroy Miller $300, but all the while he ignored the correspondence from Mr. Rosenberg. On November 16, 1960, Mr. Rosenberg wrote another letter to Mr. Sanderson stating that Leroy Miller had received $300.00 of the indebtedness and asked for remittance of the remaining $300.00. Mr. Sanderson ignored this letter. On January 17, 1961, Mr. Rosenberg wrote to Hon. Phil M. Canale, Jr., District Attorney General of Shelby County, Memphis, Tennessee, explaining the situation in full and asking for Mr. Canale's comments. This letter was turned over to the Committee on Discipline and Ethics of the Memphis & Shelby County Bar Association as above set out.

After two members of the Discipline and Ethics Committee of the Bar Association called on Mr. Sanderson about his failure to remit the remaining $300.00. Mr. Sanderson forwarded the $300.00 to Leroy Miller by telegraph on February 3, 1961. On February 23, 1961,

Mr. Sanderson was notified of a full hearing to be heard by the Committee concerning the Miller matter and possibly other matters.

On February 22, 1961, Mr. Sanderson and his wife and his father and Ridley Miller, father of Leroy Miller, drove to Decatur, Illinois, where they located Leroy Miller at his job. Mr. Sanderson took an affidavit from Leroy Miller on February 22, 1961, in which Leroy Miller acknowledged that he had loaned the $600.00 to Mr. Sanderson and expressly disclaimed the fact that he had retained Mr. Rosenberg to write and try to obtain the money for him. This affidavit was presented by Mr. Sanderson upon the hearing before the Committee on Discipline and Ethics. Leroy Miller also testified upon the trial of this cause substantially to the same effect as contained in his written affidavit. It is the contention of the Bar Association that the story about the loan was a fabrication.

Mr. Rosenberg testified by deposition that while he had not been originally employed by Leroy Miller and that he was consulted first by Beulah Eckles, mother-in-law of Leroy Miller, he felt sure that there had been no loan between Leroy Miller and Mr. Sanderson; that after Leroy Miller received the first $300.00 he, Leroy Miller, notified Mr. Rosenberg by telephone; and that he subsequently had a communication by telephone from Leroy Miller about obtaining the second $300.00 and that it was Leroy Miller himself who furnished Mr. Rosenberg the name of Hon. Phil M. Canale, Jr., District Attorney General of Shelby County, Tennessee, for Mr. Rosenberg to write to. Further, Mr. Rosenberg testified that when Mr. Sanderson brought Leroy Miller to

Rosenberg's office on February 22, 1961, to write out the affidavit setting up the theory of a loan from Leroy to Mr. Sanderson that he, Rosenberg, wanted no part of it and refused to permit his stenographer to write the affidavit and that he referred Mr. Sanderson to a public stenographer. The proof indicates that the $1,000 collection of the Leroy Miller, et al claims was deposited to the personal account of Mr. Sanderson and wife and that said funds were shortly withdrawn and expended for personal expenses.

## VI.

## THE INEZ MARTIN CASE

On October 23, 1959, Mrs. Inez Martin came to Mr. Sanderson's office and employed him to bring a divorce suit against her husband Charles B. Martin. She contracted to pay Mr. Sanderson a fee of $250.00 together with 25% of the value of all property which Mr. Sanderson procured for her as alimony. She paid Mr. Sanderson $50.00 which he showed on the receipt as being for court costs. Also Mrs. Martin paid $50.00 to a man named Sam F. Goodwin who was present in Mr. Sanderson's office at the time she came in. Mrs. Martin testified that Mr. Sanderson recommended Mr. Goodwin as a detective and she procured him to try to find a boat and some other property which belonged to her husband. Mrs. Martin and her husband had been living apart some three or four years and she had previously filed a suit against him through Hon. James Thompson, attorney of Memphis, Tennessee, and which case, by the way, was dismissed on October 23, 1959, for failure to prosecute.

In January, 1960, Mr. C. B. Martin came to Mr. Sanderson's office to talk about the divorce case and during

that conference Mr. Sanderson agreed to represent Mr. Martin in a workmen's compensation claim. The claim was not heard until December, 1960. Mr. Martin was unsuccessful.

Mrs. Martin testified that she objected to Mr. Sanderson representing her husband and that she was never able to get Mr. Sanderson to do anything for her in regard to the divorce case. Mr. Sanderson testified that he repeatedly tried to get Mrs. Martin in his office to sign the divorce bill so he could file it and that she steadfastly refused so to do though he talked to her many times on the telephone. He admitted that he refused to refund her the $50.00 deposit at or about the time she made complaint to the Bar Association in February, 1961. He insisted that Mrs. Martin agreed for him to represent Mr. Martin in the workmen's compensation claim.

The testimony of Mrs. Martin is not very convincing. It was the opinion of the court below that even if the testimony of Mrs. Martin were entirely disregarded it would be clearly established by the testimony of Mr. Sanderson himself that he had acted improperly and represented conflicting interests by accepting a retainer from Mr. Martin after having accepted employment from Mrs. Martin to file suit for divorce against Mr. Martin. It was the opinion of the court below that Mr. Sanderson would not have been in a position to vigorously and capably pursue Mr. Martin for divorce, alimony and child support with consequent citations for contempt and resulting punishment and at the same time devote his time properly to the interest of Mr. Martin in the workmen's compensation claim; that the interests of the two parties were decidedly antagonistic.

## VII.

## THE WILLIE ROBERT CRYER CASE

On January 7, 1960, Willie Robert Cryer retained Mr. Sanderson to represent him in a workmen's compensation claim which was settled on December 16, 1960, for $1,000. By agreement Mr. Sanderson retained $200.00 for his services. Mr. Sanderson paid Mr. Cryer in cash $437.80 and retained out of the $1,000 collection the sum of $362.20 for the purpose of paying the following medical bills which Mr. Cryer was obligated to pay under the terms of the settlement:

| | | |
|---|---|---|
| (1) St. Joseph Hospital | ................. | $157.20 |
| (2) Dr. Goia | ........................... | 100.00 |
| (3) Dr. Ogle | ........................... | 50.00 |
| (4) Dr. Whittemore | ..................... | 55.00 |

$362.20

On or about January 20, 1961, Mr. Sanderson paid St. Joseph Hospital $125.00 and February 15, 1961, paid Mr. Cryer the difference of $32.20 by which the hospital bill of St. Joseph had been reduced. Several times during the spring of 1961 Mr. Cryer continued to receive bills or statements from Drs. Goia, Ogle and Whittemore. He made several efforts to get Mr. Sanderson to pay these bills without success. On June 5, 1961, Mr. Cryer wrote Mr. Sanderson a letter by certified mail demanding that these bills be paid. Mr. Cryer also made complaint to Hon. James Winchester, attorney of Memphis who was chairman of the Bar Association Committee on Discipline and Ethics and who also had been the attorney for the insurance carrier in the workmen's compensation claim. Mr. Winchester took an affidavit from

Mr. Cryer and on June 12, 1961, communicated with Mr. Sanderson. Mr. Sanderson agreed to and did give to Mr. Cryer $95.00 with which he paid Dr. Ogle $40.00 and Dr. Whittemore $55.00. Mr. Sanderson paid Dr. Goia the $100.00 on July 11, 1961. Mr. Sanderson's only defense or excuse for not paying these bills promptly was that he was busy with other matters and that Mr. Cryer did not convey to him "any information indicating the necessity for precipitous activity."

## VIII.

## THE NAYLOR CASE

Mr. and Mrs. Sanderson were good friends of Mr. and Mrs. Paul Randolph Naylor. On Saturday afternoon, June 5, 1960, Mr. and Mrs. Sanderson and Mr. Naylor were out drinking. An argument came up and they started home. As they drove along the streets of Memphis they noticed a disabled automobile occupied by a young lady. Mr. Sanderson stopped the car and went over to the car and offered his help even though he did not know her. Mr. Naylor and Mrs. Sanderson then drove off and left Mr. Sanderson.

Mr. Sanderson was not able to locate his wife until the next afternoon when he found her at her sister's. Mrs. Sanderson admitted to Mr. Sanderson that she had spent the night and part of the next day with Mr. Naylor at a motel and that they had committed two acts of adultery. Mr. Sanderson then called Mrs. Naylor to their home and had Mrs. Sanderson repeat her confession in the presence of Mrs. Naylor. Thereafter Mr. Sanderson agreed to represent Mrs. Naylor in a divorce action against Mr. Naylor and on June 14, 1960, filed her original bill in the Chancery Court of Shelby County averring

cruel and inhuman treatment, abandonment, non-support and adultery with one Dorothy L. ———, referring to Mrs. Sanderson.

Mr. Naylor was represented by Hon. Harold Weiss, attorney of Memphis, Tennessee. Mr. Weiss and Mr. Sanderson worked out a property settlement and child custody agreement. On February 8, 1961, the Chancellor approved the property settlement and child custody agreement and granted an uncontested divorce to Mrs. Naylor on the grounds of cruel and inhuman treatment, abandonment and nonsupport. No proof was made of the adultery between Mr. Naylor and Mrs. Sanderson upon the trial but the matter became generally known among many members of the Memphis Bar that the Dorothy L. ——— referred to in the divorce bill was in fact Mr. Sanderson's wife.

Mr. Sanderson testified that he and Mrs. Sanderson separated on June 6, 1960, after her confession; that she remained in the home living apart from him until October, 1960, because she had nowhere else to live or go; that they became reconciled in October, 1960, and have continued to live together since that time. Mr. Sanderson further testified that he took a written statement from Mrs. Sanderson before a court reporter admitting the adultery and that he was prepared to prove the adultery if it had become necessary to do so in order to obtain Mrs. Naylor's divorce even though he and his wife were then reconciled. It was the opinion of the lower court that regardless of the truth or falsity of the charges of adultery against Mrs. Sanderson, Mr. Sanderson could not with even reasonable professional propriety have accepted or maintained employment by Mrs. Naylor in the

case and that the conduct of Mr. Sanderson in this respect was degrading, and debased the principles, precepts and ethical conceptions of the profession of the law.

## IX.

## THE MOSS CASE

The charges against Mr. Sanderson arising out of this case occurred after the original petition for disbarment had been filed and pending several months. On May 31, 1962, Mr. Sanderson filed a petition for absolute divorce in the Circuit Court of Fayette County, Tennessee, on behalf of Johnny C. Moss, aged 67, against his wife, Giovanni Wardlow Moss, age 42. They had been married only a few months. The proof shows that Mr. Moss, while only 67 years of age, is illiterate, senile and not fully capable of understanding legal transactions. He relies principally upon his married daughter, Mrs. Patty Holland, and his son Billy Moss, both of whom live in the home with him. Mr. Moss has accumulated some 900 acres of land in Fayette County and is considered well off financially though he cannot read and write.

'Mrs. Moss was represented by Hon. Jerre Duzane of Memphis, Tennessee, and his associate counsel, Hon. J. B. Matthews of Somerville, Tennessee. On July 23, 1962, at a hearing before the Hon. Mark A. Walker, Circuit Judge, Mr. Moss was ordered to pay as alimony pendente lite the sum of $150.00 per month to Mrs. Moss and also ordered to pay fees pendente lite to her attorneys, Mr. Duzane and Mr. Matthews, in the amount of $250.00.

At a conference with Mr. Sanderson at his office in Memphis, Tennessee, on July 30, 1962, Mr. Moss left a check payable to Mr. Sanderson in the amount of $437.50

which represented $187.50 alimony from July 23, 1962, through September 1, 1962, and $250.00 attorneys' fees for Mr. Duzane and Mr. Matthews. Mr. Sanderson collected the proceeds of this check on August 2, 1962. On August 10, 1962, Mr. Duzane asked Mr. Sanderson about the payment of the money from Mr. Moss and was advised by Mr. Sanderson that Mr. Moss had been sick in bed and that he had not received the money from Mr. Moss. Of course, this was untrue.

On August 15, 1962, Mr. Duzane wrote Mr. Sanderson about the money and received no answer. On September 5, 1962, he wrote Mr. Sanderson again reminding him that Mr. Moss then owed an additional $150.00 alimony making a total of $587.50 and that it was his last courteous note asking for payment of the money and notifying him that if the money was not paid by Friday, September 14, 1962, his client, Mr. Moss, would be cited for contempt. Mr. Sanderson did not reply to Mr. Duzane's letter of September 5.

On or about September 5, 1962, Mr. Matthews, associate counsel with Mr. Duzane, who lived in Somerville, collected from Mr. Moss or members of his family the $150.00 alimony from September 1, 1962, to October 1, 1962.

On September 11, 1962, Mr. Moss and some members of his family came to Memphis to the office of Mr. Sanderson and by mutual agreement they terminated Mr. Sanderson's representation for the reason that it was very difficult for Mr. Moss to get into Memphis to talk to his attorney. They had arranged for Hon. Preston Parks of Somerville, Tennessee, to represent Mr. Moss because he lived in the county where the suit would be

tried and because he was much closer to Mr. Moss' home in the same county. They agreed on a final fee for Mr. Sanderson and his relationship with Mr. Moss terminated. On the same day Mr. Sanderson left at Mr. Duzane's offices two checks drawn on himself, one in the amount of $250.00 representing attorney's fees and the other for $187.50 representing the alimony through August. The next day the checks were presented for payment to the bank and the $250.00 check was paid but the other check for $187.50 was dishonored for insufficient funds.

On September 14, 1962, Mr. Sanderson left a message with Mr. Duzane that a deposit had been made in his account and that the $187.50 check would be paid. The check was presented again on September 17, 1962, and was again dishonored. Within a day or two Mr. Sanderson picked up the check at Mr. Duzane's office and left $187.50 in cash. Upon the trial Mr. Sanderson offered as an excuse for his failure to pay the alimony and attorneys' fees promptly that he was trying to work up a lump sum settlement on behalf of Mr. Moss. While Mr. Sanderson is to some limited extent corroborated by the testimony of one of the children of Mr. Moss, the record is void of any substantial effort on his part to work out a lump sum settlement with attorneys for Mrs. Moss. If, in fact, Mr. Sanderson and Mr. Moss had an agreement (and Mr. Moss certainly didn't confirm this) not to pay the alimony pendente lite and attorneys' fees for an indefinite period in order to try to force a lump sum settlement with the wife then they would both have been in contempt of Judge Walker's court in deliberately disobeying his order for the immediate payment of the alimony and attorneys' fees.

We have not attempted in this opinion to discuss in detail all of the evidence contained in this record of over 950 pages together with a separate volume of many, many cancelled checks, bank statements, letters and other memoranda filed as exhibits. We concur in the findings of fact and opinion of the lower court.

■ It is the insistence of Mr. Sanderson before this court that since he has finally paid all of his clients all of the money which he owed them and since all of his clients involved in the nine cases charged in the petition for disbarment have expressed satisfaction with his services and no longer have any claims or complaints against him, that he should not be disbarred and that he should only be reprimanded or at most given a suspension of his right to practice law.

The reprimand which Mr. Sanderson received from the Bar Association apparently had no salutary effect whatsoever. We concur in the opinion of the lower court that Mr. Sanderson has by his conduct shown that he does not have the proper concept of the obligations devolving upon an attorney requiring him to deal fairly and honorably with his clients, with his fellow lawyers and with the courts, and requiring him to demean himself in such a manner as not to bring embarrassment to nor discredit upon his profession. The practice of the law is much more than simply a means of livelihood.

■ Mr. Sanderson has been guilty of such unprofessional conduct as renders him unfit to be a member of the bar. T. C. A. Section 29-308; Thompson v. Denman, 164 Tenn. 428, 50 S. W. (2d) 222; Smith v. State, 9 Tenn. 228; Memphis & Shelby County Bar Association v. Vick, 40 Tenn. App. 206, 290 S. W. (2d) 871.

The decree of the lower court permanently disbarring Mr. Sanderson is affirmed at the costs of the appellant.

Avery, (P.J.,W.S.), and Bejach, J., concur.

Petition to Rehear Denied

CARNEY, J. On July 31, 1963, this court rendered its opinion affirming the action of the lower court enjoining permanently the defendant-petitioner, James T. Sanderson, from the practice of law. On Monday, August 12, 1963, he filed with the Clerk of this court a document entitled "Petition to Rehear and Requested Special Findings of Fact and Law." The appellee, Memphis & Shelby County Bar Association, Inc., has filed a motion to dismiss the petition to rehear because it was not filed within the ten-day period as provided by Rule 22 of this court.

Apparently petitioner is no longer represented by counsel and the petition was drafted by Mr. Sanderson himself. At a late hour Saturday evening, August 10, 1963, the tenth day after the announcement of the opinion, the petitioner, Mr. Sanderson, called each member of this court by telephone from Nashville, Tennessee, where he was in the process of preparing the petition and offered to drive from Nashville to Jackson, Tennessee, in what would probably have been a futile effort to get the petition filed with the Clerk of this court before midnight, August 10, 1963. The petition was filed on the following Monday. In consideration of these and other circumstances, we overrule the motion to dismiss. We have considered the petition and now dispose of it on its merits.

From the opening paragraphs of the petition we quote as follows:

"Comes now the Appellant-Petitioner in this cause, James T. Sanderson, and in response to the Opinion of this Honorable Court, hereinbefore filed on July 31, 1963, would respectfully show that he is greatly aggrieved by the general, harsh, and superficial, but conclusive, findings of the Lower Court, adopted and concurred in by this Court's Opinion, and therefore, respectfully prays for a rehearing of this cause on its merits; particularly relative to the Court's findings which embraced questions of law and fact, as well as to findings which are points that necessarily union matters of fact and opinion.

"Confronted with the general, elaborate, unspecific and superficial findings of the Lower Court, adopted by reference and concurred in, apparently, by this Honorable Court, Appellant-Petitioner submits that in his petition to rehear, his position has been reduced to that of attempting to disprove negative findings of fact and law, coupled with inferences unjustifiably drawn on opinion and deduced from undisputed facts; * * *

* * * * * *

"As stated by the Supreme Court of Missouri In Re: Downs, 363 S. W. (2d) p. 679, (Jan. 14, 1963): 'The power to disbar should be exercised with great caution and disbarment should not be ordered when less severe discipline would accomplish the desired result or where there is reasonable hope of reformation.'

* * * * * *

"Your Appellant-Petitioner, then, further prays for and requests, special, specific, different and addi-

tional findings of fact and law relative to each of the nine (9) specifications or charges embraced in the original bill in this cause, as are reflected by the record.''

The petition to rehear contains 87 typewritten pages plus an appendix. It would prolong unduly this opinion and serve no useful purpose to discuss in detail all of the assertions made and the findings of fact requested by the petitioner. The substance of the petition to rehear is a request by the petitioner to find the facts relating to each of the nine charges against him in accordance with the testimony of the petitioner and his witnesses. This, of course, we cannot do. We have reviewed our former opinion. With reference to some of the charges against Mr. Sanderson we have made some additional findings of fact:

(1) The Woodrow Baldwin case—No additional findings of fact.

(2) The William Newby case—No additional findings of fact.

(3) The Berryman case—The only additional finding of fact in connection with the Berryman case which we deem material is that we find the preponderance of the evidence to be in favor of the testimony of Mr. Strauch and Mr. Byrd that upon their first interview with Mr. Sanderson on September 17, 1958, he told them that he did not feel that he had done anything wrong in giving the girl the name of the abortionist; that he had sent another girl or woman whom he himself had gotten pregnant to this same abortionist. Mr. Sanderson had denied that he made this statement to them.

(4) The Thomas Oren Byrum case—No additional findings of fact. However, we observe that Mr. Sanderson apparently doesn't understand that he was guilty of unprofessional conduct in failing to acknowledge the letter from Mr. Davis. At the time he received the letter from Mr. Davis on or about September 23, 1958, he had then been in the possession of $400.00 which belonged to his client and uncle, Mr. Byrum, since June 5, 1958. The fact that his client, Mr. Byrum, had found it necessary to retain another lawyer to collect from him, his own lawyer, the $400.00 should have been most embarrassing to Mr. Sanderson. He should have promptly acknowledged the receipt of the letter from Mr. Davis with a reasonable explanation for his delay in remitting the $400.00 and should have remitted immediately the $400.00 to his former client, Mr. Byrum, through the new attorney, Mr. Davis. Instead, he ignored the letter of Mr. Davis and dealt with his uncle and former client directly.

(5) The Leroy Miller case—We expressly concur in the finding of the lower court that there was no bonafide loan between Leroy Miller and the petitioner, Mr. Sanderson. The testimony and conduct of the attorney, Mr. Rosenberg in Decatur, Illinois, are much more convincing than the testimony and conduct of the petitioner, Mr. Sanderson, and his former client, Leroy Miller. If Mr. Sanderson had in fact borrowed the money from Leroy Miller, as he testified, on April 14, 1960, then certainly when he received Mr. Rosenberg's letter of August 26, 1960, making demand for the $600.00, Mr. Sanderson would have communicated immediately with Mr. Rosenberg either by telephone or by letter and explained to him that he had an arrangement with Miller for the loan of the money. Instead, he chose to ignore Mr. Rosenberg's

letter just as he ignored his second letter of September 15, 1960, and his third letter of November 16, 1960.

Even though Mr. Rosenberg threatened in his second letter of September 15, 1960, to take the matter up with the local Bar Association, Mr. Sanderson deliberately ignored Mr. Rosenberg's demands. The petitioner offered no explanation of his failure to reply to Mr. Rosenberg though he received at least three letters from him.

(6) The Inez Martin case—There is a material conflict between the testimony of Mrs. Martin and the testimony of the petitioner, Mr. Sanderson, over one determinative question involved in this charge; that is, whether or not Mrs. Martin agreed for Mr. Sanderson to represent Mr. Martin. Since Mrs. Martin seemed to be more interested in harassing her husband by litigation than actually obtaining a divorce, it seems improbable that she would have consented for Mr. Sanderson to have represented Mr. Martin in his workmen's compensation claim. For this reason we find that the preponderance of the evidence is that Mrs. Martin did not agree for Mr. Sanderson to represent her husband, Mr. Martin. Thus we concur in the finding of the Chancellor that Mr. Sanderson was representing conflicting interests. However, we further find that Mrs. Martin was not prejudiced by Mr. Sanderson's conduct in her right of action for divorce against Mr. Martin.

(7) The Willie Robert Cryer case—No additional findings.

(8) The Naylor case—Mr. Sanderson was guilty of gross impropriety in accepting retainer by Mrs. Naylor in a divorce suit against her husband when one of the principal grounds for the divorce was the alleged adultery

by Mr. Naylor with Mrs. Sanderson. Mr. Sanderson did not think such conduct was improper at the time he took the case and his argument in the petition to rehear indicates that he still doesn't see the impropriety of such conduct.

(9) The Moss case—We find that Mr. Sanderson did not withhold payment of the $437.50 alimony and attorneys' fees from Mr. Duzane because of a purpose to attempt a lump sum settlement, as he testified, but that Mr. Sanderson withheld the funds because he had converted them to his own use. It was not until after he had collected a final fee from Mr. Moss that he offered to pay the $437.50 to Mr. Duzane and it is significant to note that one of the two checks which he gave Mr. Duzane in payment was dishonored by the bank.

We find nothing in the petition to rehear which requires or justifies us in changing our former opinion. It is our unpleasant duty and task to overrule the petition to rehear.

Avery, (P.J.,W.S.), and Bejach, J., concur.